ALVINA MANLEY and PATRICIA ANN MANLEY, Dependents of ARCH H. MANLEY, Deceased, Respondents, v. AMERICAN PACKING COMPANY and CONSOLIDATED UNDERWRITERS, Appellants, No. 43091— 253 S. W. (2d) 165.

Division One, December 8, 1952.

*Luke, Cunliff & Wilson* and *Earl B. Wilson* for appellants.

*Dearing & Matthes* and *Will B. Dearing* for respondents.

HOLLINGSWORTH, J.—This is a workmen's compensation case. The appellants are the employer of Arch H. Manley, who died on September 30, 1949, and employer's insurer. The respondent claimants are the dependent widow and minor child of deceased. The Industrial Commission found that Manley's death was the result of injuries sustained to his right knee on April 24, 1947, in an accident arising out of and in the course of his employment, and awarded claimants compensation in the sum of $10,375. Defendants do not question the amount of the award if his death is compensable. They contend that the finding of the Commission is not supported by the evidence, and that the evidence shows Manley's death was not caused by the injuries originally sustained, but by a new, independent and intervening cause not arising out of or in the course of his employment, to-wit: a subsequent accident re-injuring said knee. The amount in dispute is in excess of $7500, thereby investing this court with jurisdiction of the appeal.

It is conceded that on April 24, 1947, Manley sustained severe injuries to his right knee in an automobile accident arising out of and in the course of his employment. Compensation was paid to him at the rate of $20 per week until he resumed his work on or about August

18, 1947, a total of $320. On June 14, 1948, he filed a claim for further compensation alleging a permanent injury, in that his "right kneecap [was] separated from its attachment to the tibia bone. Employee walks with limp and is unstable on his feet." The employer and its insurer denied the allegations of the claim. A hearing was had on that claim on February 10, 1949, following which a temporary or partial award of $20 per week was made " to begin date employee becomes disabled from injuries . . .", and the cause was reset for further hearing on October 1, 1949. He, however, continued to work at a higher wage than paid him before he was injured and no further compensation was paid. On September 26, 1949, Manley suffered a fall while visiting at the home of his father, re-injuring his right knee. During the course of a surgical operation in progress on September 30, 1949, to repair the knee, Manley suddenly expired as the result of a pulmonary embolism.

Thereafter, Manley's widow and minor daughter were substituted as claimants in the pending claim and also filed a new claim alleging that Manley's death was the result of the original injury of April 24, 1947. These two claims were consolidated. Upon hearing of the consolidated claims before the referee, the evidence taken at the first hearing was made a part of the record and additional evidence was adduced. The referee found that as a result of the initial injury Manley had suffered 75% permanent partial disability of his right [167] leg at the knee and made an award on the first claim in the sum of $2400, less the $320 theretofore paid. On the second claim, he found that Manley's death was not the result of the initial injury and made an award of no compensation. Upon review, the Industrial Commission found that his death was the result of the initial injury, reversed the awards made by the referee and awarded claimants the aforesaid sum of $10,375, less the sum of $320 theretofore paid. The circuit court on appeal affirmed the award of the Commission.

At the hearing on the original claim Manley had testified: He was then fifty-two years of age. He was and had been a travelling salesman in the employ of defendant American Packing Company for about five years, driving an automobile in making the territory allotted him. He had been wounded in action in World War I, which left him with a herniated injury to his left leg. For that injury he received disability benefits from the Government, calculated on a basis of 66% disability. He described the automobile accident in which his right knee was injured and in lay language detailed the results of that injury. His right knee would not hold him. "I come down and never know it." He cannot drive a car in city traffic; is "out of luck" on granite floors in office buildings, and uses a cane to keep from falling on his face. He wore a thigh brace on the left leg before the injury to his right knee and was able to get around, but,

subsequent to the injury to his right knee, he could not wear the brace; it threw all the weight on his right leg.

At this hearing, Dr. F. G. Pernoud, a physician specializing in general surgery, testified: He examined Manley on January 15, 1948. X-rays were taken. Nearly two-thirds of Manley's right kneecap (patella) was missing. The remaining portion, the upper part, was two inches higher than its normal position. The kneecap is one of the most important bones in a person's leg, in that it covers over and is the protector of the front of the knee joint. All of the large muscles on the front of the thigh, identified as the quadriceps extensor muscles, form a tendon which is an inch wide. This tendon goes down into the top of the kneecap, spreads out over it and carries on below over the point of the kneecap and becomes that which is identified as the patella tendon, which in turn goes from the lower end of the kneecap to the shinbone. It is the most important stabilizing factor of the knee joint and it should have exactly the proper tension and the proper length to hold the knee joint fixed. With two-thirds of the kneecap destroyed and with the remaining one-third of the kneecap pushed upward approximately two inches the remaining portion cannot function in a normal manner. X-rays also revealed some absorption of the tibia and traumatic arthritis. This absorption is progressive, but the witness could not say whether it was still progressing, was now stopped or would stop in the future. He also examined Manley's left leg. If Manley had not injured his right knee, his left leg, when braced, would permit him to go about to the extent of 75% of normal. With the right leg injured he is 90% disabled.

At the same hearing a report of Dr. John P. Murphy was admitted in evidence. It stated that Manley complained of frequent falls because of weakness in his right knee. He found that Manley walked with a cane and had a definite right-sided limp; that the "inferior pole of the patella is separated from the main body of about ¾″ and the patient is able to straighten the knee, actively, to 40 degrees only. There seems to have been some stretching of the patellar ligament. He also lacks about 25 to 30 degrees of normal flexion of the knee joint." X-rays revealed "an ununited fracture of the lower pole of the patella with about 1″ separation of the fragments."

At the hearing subsequent to Manley's death, Mrs. Manley testified: Mr. Manley's right leg would give way causing him to fall, in just walking through the rooms of their home, unless he caught on to something. He fell while in the bathroom. Prior to the injury to his right knee, he wore a thigh brace on his left leg, and only occasionally had any noticeable limp.

Arch H. Manley, Jr., 28 years old, son of deceased, testified: On Sunday morning [168] September 26, 1949, he and his father went to the country to visit his grandfather. After visiting in the home for a short while witness and his father walked into the orchard, "and that

is why his leg gave way on him''. Witness was slightly in front of his father and about thirty feet distant from him. He noticed his father as he ''was almost down''. He ''just sort of folded'' on his right leg. The orchard where his father fell was level, unplowed ground, in bluegrass and clover not over six or eight inches high. He helped his father into the house. His leg was badly swollen. That evening it had swelled to four times its normal size.

Dr. John J. Connor, post-mortem physician for the Coroner of the City of St. Louis, testified by deposition: He performed an autopsy on the body of Arch H. Manley on September 30, 1949. Manley died of a pulmonary embolism, fracture of the patella and sodium pentothal anesthetic. Pulmonary embolism means there was a formed blood clot in the pulmonary artery. The clot was all fiber, indicating it was formed before death. It was his opinion that Manley's fall in September, 1949, produced the embolism and that the injury to his right knee on April 24, 1947, could have caused his leg to •be weak.

Dr. Oscar P. Hampton, a physician specializing in diseases and injuries of the bones and joints, testified by deposition: He first saw Manley at St. Luke's Hospital on September 27, 1949, at which time he obtained a history of the case. X-rays showed that the lower 25 to 30% of the right kneecap had been removed. There was considerable swelling and fluid in the joint with a palpable defect below the remaining portion of the kneecap. It was the witness's conclusion that the best course to pursue was another operation to repair any new or old defect in the extensor mechanism of the thigh and to restore the tendon structures coming from the muscles of the front of the thigh and passing into the ligament which normally runs from the kneecap to the bone of the leg. During the progress of the operation, the patient suddenly expired. Witness had learned from the coroner's report that the patient died from a pulmonary embolism. The fall on September 26th would not have caused the embolus to form but the old injury with its resultant immobilization of the leg and the swelling and application of the bandage would be secondary to the fall and in that manner the embolism could have resulted from the fall. It was not due to the operation or the anesthetic. The clot had formed before the operation began and was loose in the blood stream but had not reached the heart. A tourniquet had been applied which would have prevented its escape from the field of operation. If the clot had formed as a result of the operation, the embolism would not have occurred until several days later. The condition from which Manley was suffering was not of an injury two or three days before, but was essentially a thinned out weak tendon attachment below the kneecap, which would have produced instability on the part of Manley when he was attempting to walk.

On cross examination, the witness was asked this question and gave this answer: ''You, of course, don't know of your own knowledge

whether or not the accident which this man had in the automobile some two years before the second accident was the cause of his fall on September 25 or 26 or not, you assumed that in this hypothetical question when you gave your answer?" "I have concluded that it is reasonable it was the cause of his fall in the light of my findings from the physical examination and the operation."

Dr. John P. Murphy, testifying by deposition in behalf of defendants, gave it as his opinion that the pulmonary embolism causing Manley's death came from the fall in September, 1949, rather than the original injury of April 24, 1947. It was his further opinion that as a result of the injury to his knee on April 24, 1947, Manley's leg would be weak and unstable and the fall suffered by him in September, 1949, could have been due to the weakened condition of his leg.

Defendants argue that the fall sustained by Manley in September, 1949, and which was the immediate cause of the embolism resulting in his death, broke the chain of causal relationship of the original accident **[169]** and became a new, independent and intervening cause not arising out of or during the course of his employment. Claimants contend that his death was the result of a continuous chain of causes directly arising out of and so connected with the original injury as to make it the efficient and essentially producing cause.

"The chain of causation means the original force and every subsequent force which it puts in motion. If an accident causes an injury and that injury moves forward step by step, causing a series of other injuries, each injury accounting for the one following until the final result is reached, the accident which set the first injury or force in motion is responsible for the final result. It is immaterial that the final result might not ordinarily be expected. It is enough if the injury in a given case did produce the final injury or death." Schneider on Workmen's Compensation, Vol. 6, p. 53, and cases cited in footnotes.

"Thus injuries which follow as legitimate consequences of the original accident are compensable, and such accident need not have been the sole or direct cause of the condition complained of, it being sufficient if it is an efficient, exciting, superinducing, concurring, or contributing cause; thus it is immaterial whether or not a disability results directly from the injury or from a condition resulting from the injury. So, also, if the resultant disability is directly traceable to the original accident, the intervention of other and aggravating causes by which the disability is increased will not bar recovery. The inquiry as to whether to result is the natural and probable, or a normal or abnormal one, is immaterial." 71 C. J., § 390, 635-636.

We have found no Missouri case in point. However, the following cases from other states are fairly analogous:

In Gallagher v. Hudson Coal Co., 117 Pa. Super. 480, 178 A. 161, on May 11, 1932, claimant fell and fractured his kneecap. In reduc-

ing the fracture the bone was wired and there was apparent recovery. Claimant received compensation payments until October 16, 1932. On January 16, 1933, claimant went to work for another coal company. He had experienced some difficulty with the injured knee before accepting the last employment. On January 26, 1933, the injured knee gave way and claimant fell. There was a discharge of pus at the site of the fracture and an operation was performed in an effort to strengthen the knee by a tendon graft. The court affirmed an award against the former employer, saying: "The proximate cause of the second accident was the giving way of his leg due to the weakened condition of the tissues about the kneecap, as a result of the first accident. If his leg had been sound and well, it would not have given way. If he had tripped over some object and fallen, causing a new injury, this defendant would not have been liable for the resulting disability. But when the leg gave way from weakness, or inflammation, which was the result of the first fall, the disability following the fall, which resulted from this weakness or inflammation, may properly be referred back to the original injury."

In Harnischfeger Corporation v. Industrial Commission, 253 Wis. 613, 34 N. W. 2d 678, a workman had fractured his left leg in a compensable accident resulting in an osteomyelitis and in a ten per cent permanent partial disability as to use of his leg. Five years later he refractured the same leg in an automobile accident. Four years after the second accident, he sustained a pathological fracture of the same leg while walking. A finding of the commission that the spontaneous fracture was the proximate result of the original injury and, therefore, compensable was affirmed.

In G. H. Hammond Company v. Industrial Commission, 288 Ill. 262, 123 N. E. 384, the employee suffered an injury which resulted in an abscess. To relieve that condition a surgeon found it necessary to cut and chisel away a part of the bone so that the limb gave way because of the weakened condition while the employee was getting out of bed, causing a hemorrhage [170] requiring an operation from which he died. An award in favor of employee's administrator was upheld.

See also: Bailey v. Industrial Commission, 286 Ill. 623, 122 N. E. 107; Selak v. Murray Rubber Co., 8 N.J.M. 838, 152 A. 78; Marshall v. City of Pittsburgh, 119 Pa. Super. 189, 180 A. 733; Stephens v. Spuck Iron & Foundry Co., 358 Mo. 372, 214 S. W. 2d 534.

The cases cited by defendants do not sustain their contention. In each of them the injury for which compensation was sought was the result of a new, independent and intervening cause. The following are illustrative of their general tenor:

In Hager v. Pulitzer Publishing Co., Mo.App., 17 S. W. 2d 578, the evidence showed that an employee, after receiving an injury in the course of his employment, almost immediately thereafter received another injury through his own misconduct and not in the course of

his employment. An award of no compensation for the latter injury was affirmed.

In Bunge Bros. Coal Co. v. Industrial Commission, 306 Ill. 582, 138 N. E. 189, an employee, who had sustained a compensable injury, thereafter contracted a venereal disease which postponed his recovery. It was held he could recover only for such disability as was solely caused by the original injury.

In Kill v. Industrial Commission, 160 Wis. 549, 152 N. W. 148, employee cut his wrist while at work and it became infected. In nature's process the germs were walled off and in due time would have been expelled from his system if he had given his wrist only moderate exercise. Thereafter, he entered into a boxing bout with knowledge of the danger of re-injury to his wrist. It was re-injured in the bout and the infection was reactivated. It was held that the facts warranted a finding that the boxing bout was the proximate and intervening cause.

The evidence in this case warranted the Commission in finding that the injuries sustained by Manley in the automobile accident seriously weakened and impaired the use of his right knee, rendering him unstable in walking and, without warning, frequently causing him to fall; that his fall in the orchard while walking on level, unplowed grassland, was due to the weakened and injured knee rather than to some external force; and that the fatal embolism which followed was, in fact, the culmination of a series of injuries, beginning with the original, each in sequence thereafter being the result of the one immediately preceding. The award is supported by competent and substantial evidence.

The judgment of the circuit court is affirmed. All concur.