John B. OERTEL (Employee), (Claimant) Respondent,

v.

JOHN D. STREETT & COMPANY, Inc. (Employer), and Zurich General Accident & Liability Insurance Company, Ltd. (Insurer), (Defendants) Appellants.

No. 29258.

St. Louis Court of Appeals.

Missouri.

Dec. 20, 1955.

Motion for Rehearing or to Transfer to Supreme Court Denied Jan. 13, 1956.

J. C. Jaeckel, Moser, Marsalek, Carpenter, Cleary & Carter, St. Louis, for appellants.

Thomas L. Sullivan, St. Louis, for respondent.

ANDERSON, Presiding Judge.

This is a compensation case. The employer and insurer have appealed from a judgment of the circuit court. reversing a final award of the Industrial Commission which allowed claimant permanent partial disability. benefits in the sum ·of $30 per week for sixty weeks, subject to a credit of $17.14 previously paid.. The judgment appealed from was for the amount previously allowed by the referee of the commission, to

wit, permanent partial disability of the body as a whole in the sum of $30 per week for one hundred weeks, subject to a credit of $17.14 previously paid.

Claimant, who was thirty-eight years of age at the time of the hearing, sustained an injury to his back on March 20, 1952, while in the employ of appellant, John D. Streett & Company, Inc. That concern was engaged in the manufacture of anti-freeze compounds, and claimant was in charge of the batching and mixing department. The injury was sustained about the middle of the afternoon of the date mentioned. At that time claimant was standing on a platform and, with two helpers, was engaged in hoisting a 100-pound bag of borax to the top of a tank alongside the platform. The two helpers were hoisting the bag with a rope, and claimant was guiding it. Claimant testified: "As they started to lift, it started to swerve off the platform and feeling it would hit the tank and burst, I grabbed hold of it and that pulled me off balance and pulled my right leg down on the top step. * * * That is when I experienced pain * * * in the lower part of my back * * * right down the lower middle part of the back." It was a sharp pain. Claimant remained at the plant until quitting time, 4:30 p. m., cleaning up and getting ready to go home. The handling of the bag of borax completed his duties for that day. His back pained him when he left the plant. At first it was a very severe pain, then it became more of a dull pain. This pain was no better when he got up the next morning, and then he began having pain in his left leg—the back part of the hip and down through the calf of the leg to the ankle.

Claimant went to work the morning of March 21st, and reported that he had probably sustained an injury because his back and leg were bothering him. He worked at his usual duties that day, which consisted of operating an electric pump, which was set in motion by pressing a button, and controlling the flow of liquids to the mixing tank by operating a 4′ valve which functioned very easily.

On Monday, March 24, 1952, the employer sent claimant to Dr. Vigo. The doctor applied heat and diathermy, and gave claimant pills for the relief of his pain. He saw the doctor daily for a week, the treatment each time being the same as that administered on his first visit. Dr. Vigo referred claimant to Dr. J. Otto Lottes for X-rays and examination. The latter gave claimant a prescription for pills, advised him to stay home, and told him to wear a belt. Claimant thereafter procured a belt, which was paid for by the insurance company. Claimant was away from work for one week, April 3rd to April 7th, on Dr. Lottes' order. He saw Dr. Lottes only once, but continued to be treated by Dr. Vigo after his return to work.

Claimant remained in the employ of John D. Streett & Company until the latter part of May. He wore the belt until shortly before he quit. He avoided all types of strenuous lifting, but occasionally assisted others in lifting bags weighing 100 pounds. Claimant left the employ of Streett & Company the latter part of May to accept a better job, at higher pay, with Woodtreating Chemical Company.

Concerning the condition of his back during the period between March 20th and the date he left Streett & Company, claimant said: "Some days it was all right and other days it was not so good. In other words, this trouble in my back, particularly in my leg, would come and go. * * * I had to be cautious of my back. I had to be careful what I did. I noticed that any time I used my back it would cause me pain * * * generally in the back, and it would develop in the leg."

Claimant testified on cross-examination that during the eight or nine weeks after the accident he did get better. He stated: "I had improved but I had to watch. I was forever conscious of what I was doing when I had to use my back. For instance, stepping off the curb. The only way I can describe it, I had what I call agony days * * * I was better than when the accident happened. I had improved."

Claimant's work at the Woodtreating Chemical Company was similar to the duties he performed at Streett & Company. It involved some heavy lifting. He stated:

"I had no serious trouble while at Woodtreating. I was merely helping there and I didn't have the full scope of my duties there.

"Q. Were you able to do that heavy lifting? A. I did some of it, yes. I was a helper. Another fellow was in charge of the batching and mixing.

"Q. Were you able to do the heavy lifting at that time with this Woodtreating Company perhaps better than for the period with Streett & Company during April and May, 1952? A. Yes, I would say so."

Claimant testified that before he left Streett & Company he discarded the belt, and did not again wear the belt until he suffered another accident in August. He stated that while working at Woodtreating Company his back bothered him some, but was not severe, and that on the days his back bothered him he did no lifting. He stated:

"I would say several times during June I would feel slight pain here (indicating), and a tingling in my leg, nothing severe.

"Q. What about July? Any trouble at all of any kind? A. No. It seemed like in July I felt pretty good.

\*    \*    \*    \*    \*    \*

"Q. By pretty good, you mean you had no pain whatsoever? A. That's right."

Claimant attended a family reunion at Decatur, Illinois, on Sunday, August 3, 1952. On that occasion he participated in a softball game. The other participants were children aged 7 to 13, and two adults. The ground upon which the game was being played was not uneven. However, there were clumps of grass in it. Claimant was playing between third base and shortstop. While in this position a small girl hit a "grounder" which bounded toward him. The ball was not hit hard. Claimant fielded the ball, and in doing so made three quick steps to his right and forward. He stated: "I stooped to get the ball, in a half-stooped position. As I attempted to pick up the ball, I sustained pain in the back." The pain was in the lower or middle part of the back and was similar to the pain he had in March, and in the same location.

On cross-examination, he said: "There was pain when I stooped over, but it was not severe until I straightened up." He did not fumble the ball or drop it; nor did he stumble or fall. On cross-examination claimant said that the bases were close together; that he was "somewhat charging" the ball as he went for it, and "I had to throw it to first in a hurry." The throw was made underhanded and across his body with his right hand. He testified: "I imagine there was a partial twist (of the body) involved," as he made the throw. He noticed the pain when he started to straighten up from the stooped position. He was not wearing the belt at the time.

The pain in his back persisted, and on his way back to his home in East St. Louis his left leg began to pain. He did not go to work the next day, and was off from work during the whole of August. He returned to work the first week in September. His employer, Woodtreating Chemical Company, sent him to Dr. Thomas O. St. John on September 8th for an examination, following which he was laid off because of the information contained in the report made by Dr. St. John. He did not wear the belt daily between September and the following February, but did wear it frequently after having sustained a bad sprain in October. He received unemployment compensation benefits from October until February. Although he made numerous attempts to obtain employment, he was unable to do so until March 12, 1953, when, on his own initiative, he secured employment as a real estate salesman. He was so employed at the time of the hearing.

In February, 1953, while carrying a wire incinerator basket containing cans weigh-

ing 30 or 40 pounds, he experienced a similar onset of pain in the back and leg. He testified that nothing unusual occurred on that occasion, and that he noticed the pain while putting the basket down. He did not slip, stumble or trip, or become overbalanced. Since that time he has worn the belt, or corset, a considerable part of the time.

Claimant further testified that shortly thereafter, while preparing to change a tire on his automobile, he again sustained pain in his back and leg. This occurred when he reached for the jack which was located in the trunk compartment of the car. On cross-examination, he said that nothing unusual happened at that time. He did state, however, that he did have to stretch to reach for the jack, and the pain occurred when he straightened up. Claimant further testified that, since that time, if he is on his feet very much or does much walking he has pain in the lower middle portion of his back and in the left leg.

Prior to sustaining the injury in March, 1952, claimant had never sustained a back injury. He had never been in a hospital for treatment of his back. He had never had rheumatism in his back, or had any trouble with his back or leg. Before March 20, 1952, he was very active in sports, such as golf, baseball and swimming. He had been in the United States Army and had suffered no injuries during the term of his service. He has not engaged in sports since August, 1952. He has been wearing a corset since February, 1953.

Dr. J. Otto Lottes was called as a witness for claimant. He examined claimant on March 31, 1952. In this examination he found evidence of an intervertebral disc lesion between L–5 and S–1 on the left. When asked what were the objective signs of that condition, the doctor replied: "He had limitation of back motion. There was tenderness on pressure over this interspace. He had limited straight leg raising on the left and a positive sciatic tension test on the left. He was tender over the superior gluteal and the sciatic nerves on the

left, and he had a diminution on pin prick (sensation) over S–1 dermatone. That is the nerve that supplies that region. He was tender over that area."

The doctor took X-ray photographs of the lower lumbar vertebrae and the upper part of the sacrum. These revealed a narrowing of the interspace between L–5 and S–1. He stated that this usually indicates a loss of substance between the vertebrae and "I thought he had an intervertebral disc lesion at the L–5—S–1 space on the left which was producing pressure over the first sacral nerve root. * * * Usually when a person has a disc lesion it means that the disc is either bulging or has broken out of its ordinary cover, and if the disc lesion is only a bulging disc and the bulge hits the nerve root they have what this man has got. Also, if the disc has broken all the way out, you have this same thing that this man had at that time. The only difference is if the lesion had not broken out and still is bulging, sometimes, by manipulation, change of posture, this will be sucked back in the space and will relieve the symptoms. Also, sometimes when they are broken all the way out, certain movements can dislodge the disc material from the nerve root and then their symptoms subside, but they can go ahead and have recurrence at any time from no cause or from strenuous exercise or lifting."

Dr. Lottes read in evidence an entry in the office records of August 4, 1952, made by Dr. Leydig, his office associate. Said entry is as follows: "Patient did very well with the belt until a few days ago when he was playing softball. Then he started to get extreme pain down the left leg again. At the present time patient seems to be very disabled and extremely uncomfortable, despite the fact he is wearing his belt. Upon examination, tenderness is very localized over the left lumbo-sacral junction and pressure there even causes pain clear down the leg on the outside. Straight leg raising on the right causes pain in the left side down the leg. Straight leg raising on the right is not only limited at forty degrees, but extremely painful and tension

on the sciatic nerve is very painful. There was considerable weakness on extension of the big toe of the left foot compared to the right. Patient undoubtedly has a disc lesion which I believe at the present time should be explored. As he has had two definite attacks I do not believe he will get along with conservative treatment and was advised to have surgery." Dr. Lottes did not see claimant on August 4, 1952, when he was examined by Dr. Leydig.

On cross-examination, Dr. Lottes said that claimant's disc condition could be either a bulging of the disc, or that the disc had broken completely out of the cover; that pressure on the nerve root from a bulging disc is the same as one from a broken disc, and that it was impossible to determine the exact nature of the condition without an operation. He stated that, in either case, through postural changes or manipulation, the disc could be sucked back to normal position or dislodged from pressing on the nerve root. He further stated that a man who has had a disc lesion cannot return to heavy lifting and bending. The more he bends and lifts things, or twists about, the greater chance he runs of having a recurrence of pressure on the nerve root. He was of the opinion that the incident of August 3, 1952, during the softball game, was not a second injury. He stated that once a person has a disc lesion he is subject to recurrent attacks for the rest of his life unless the disc is removed. The doctor further testified:

"Q. If you were exposed to a history from a patient which he gave you, that for a period of a month, three months after the original injury, in the fourth month after the original injury he experienced no pain at all, he doesn't wear his corset any longer, during that entire month he does the work I referred to, then it is possible that that disc has slipped back into the interspace?

\* \* \* \* \* \*

"A. It is possible."

The doctor further testified that in such a situation it could not be said that the man was actually normal, because of the possibility of the disc slipping out of place again.

Dr. Charles F. Alderson was called as a witness for claimant. He examined claimant on August 25, 1952. His findings, from which he made a working, but not final, diagnosis were:

"There was a point of tenderness over the right sacroiliac region. The patient was unable to flex his leg, that is, bring the leg up and straight on up and out; and he complained of severe pain on movements. There was some muscle spasm in the back. They were the only objective findings of a general syndrome of the back at that time. He did walk with a limp. I made a working diagnosis. I didn't make any definite diagnosis because I didn't have any X-rays.

\* \* \* \* \* \*

"Q. What was your working diagnosis, doctor? A. Nucleus pulposus or possibility of a slipped disc."

Asked whether, in his opinion, the condition just referred to existed prior to claimant's participating in the softball game, he said: "From the history, considering the case, \* \* \* I would think that the original thing probably happened at the injury when he fell on the steps."

On cross-examination, Dr. Alderson's attention was called to the fact that, in reciting the history connected with the March incident, he used the words "he had trouble with his back for a period of several months and then improved"; whereas, in his record, the word "recovered" was used instead of the word "improved." In explanation, he said:

"What I meant, he recovered from his discomfort, his difficulty, and was able to work. I didn't mean he recovered from the trouble he had other than for the symptoms. In other words, he had a remission from the pain. That left for a period and it recurred when he had this incident in Decatur, Illinois.

I didn't mean to say he recovered from whatever condition he may have had. That would be an assumption if I said he recovered. I did not have any X-rays and I didn't know. I couldn't say. * * * I meant by the word 'recovered' he was treated in the meantime by the company doctor. He had trouble with his back for a period of several months and then recovered. What I mean, he was treated by a doctor over a period of time and he recovered enough to go back to work with no trouble with his back apparently. That is what I meant. * * *

"Q. Doctor, from your experience in the treatment, in treating this type of case, would you say that following these original symptoms that this man described to you and the symptoms following the occurrence in March, with a working diagnosis of a slipped disc, could this man have actually experienced a total recovery? A. Yes, sir, he could."

Later, in the examination the doctor testified:

"The slipped disc doesn't recover by itself. In other words, what I mean to say, if a man has a nucleus pulposus that is giving pain, he doesn't recover without operative treatment. That doesn't happen. In other words, the mechanics, the pathology wouldn't permit that."

Asked to account for the fact that there was alleviation of pain in July, the doctor replied:

"His back was probably immobilized, and it is possible for that irritation to subside and they go for a period of time without having any pain, actual disabling pain, and then * * * some little thing may set it off, a little jerk of the foot will set it off. * * * It would be my opinion. * * * supposing the original injury was a nucleus pulposus, and then he had the history of what happened to him in Decatur, playing softball, that could have been enough to irritate and set it off again, bring about the acute stage, pain and discomfort.

*    *    *    *    *    *

"Q. Doctor, would you say that Oertel aggravated a pre-existing condition by this incident that occurred in August that he described to you? A. That would be my supposition, yes, sir. * * * He had a definite injury before and supposing it is a nucleus, that definitely set it off again at that time, because his symptoms and so forth were the same as they were before. * * * Sometimes the slightest stress or strain placed on the spine will cause that."

Dr. Thomas O. St. John testified on behalf of claimant. He examined claimant on September 8, 1952, which was after the softball incident. He read from the report which he made to claimant's employer. In this report it was stated:

"Our examination makes us believe this man definitely has a ruptured disc in the lower lumbar region of the back. The X-ray findings are grossly negative; however, the other signs are definite for a diagnosis."

On cross-examination, the doctor testified that he would be unable to state with any degree of certainty exactly what this man's condition was immediately following the original accident of March, 1952, for the reason that he did not see claimant until the September following. In answer to a hypothetical question, the doctor stated:

"It would be my opinion that if this man had the condition in March, 1952, and was able to play ball in August of 1952, that most likely the disc had been restored to its normal position to enable him to play, and that in the stooping over in the unusual position, that the disc once more came into prominence.

*    *    *    *    *    *

"Q. Now, * * * do you think that that occurrence, fielding the softball, constituted a second accident?

* * * A. I would state, in my opinion, it is a second accident."

Dr. Samson Wennerman was called as a witness for claimant. He examined claimant on April 14, 1953, and also on May 29, 1953. He stated:

"My original diagnosis was a possible fracture of the transverse process of the fourth lumbar vertebra on the left, chronic low back strain, probable ruptured intervertebral disc."

Dr. Wennerman gave it as his opinion that claimant's disability was about 40% of the man as a whole. He stated that the 40% disability was permanent unless radical procedure was taken, such as an operation. The witness, in answer to a hypothetical question which detailed the facts with reference to the March, 1952, accident, and the incident in August, stated that in his opinion the original accident was the cause of claimant's trouble. He also stated:

"The original condition was caused in March, 1952, and the only other effect of the August incident might have been an aggravation of a pre-existing condition."

He further testified that the bulging disc or ruptured disc never returns to normal position to become as firmly attached as it was before. Asked how he justified that last statement, the witness stated:

"In the same way as I say no inguinal hernia in an adult heals without surgery, because there has been a rupture, there has been a tearing. It may go down when the fellow lies down, but if he coughs, sneezes, or gets up, his hernia comes down, and this is a hernia. Some men call it a herniated disc. * * * The bulge may go down in the same way a bulge in a hernia will go down. * * * It is caused because there is a weakness in the wall surrounding it. * * * I don't think it is a bulging disc. I think it is a ruptured disc; but again I don't know without looking in there."

The witness further stated that it was possible that it was a bulging disc.

Dr. Oscar P. Hampton, Jr., was called as a witness for appellants. He examined claimant on behalf of the insurer on May 8, August 14, September 16, and December 23, 1952, and on April 7, 1953. At these examinations there were no objective findings of injury or disease. The range of forward bending varied with claimant's complaints of pain; varied from an excellent range to one which was somewhat less than normal. On some occasions he would lean forward so that his fingers would come to about three inches of the floor, and on others it would be ten, twelve or fourteen inches from the floor. Claimant complained of tenderness in the back—a subjective finding—and complained of pain on straight leg raising. On the last examination, claimant complained of pain on straight leg raising on the left at forty-five degrees, whereas it was carried out through seventy-five on the opposite side. There was no synergy deficit, no basic changes, and no protective muscle spasm in the back at any time. X-rays were made at the first examination. They did not show any abnormalities of significance or evidence of injury. The intervertebral spaces were normal. A working diagnosis, based upon the history given by the claimant and his subjective complaints, was:

"There was a strain of the back in the lumbo-sacral region. * * * There was a distinct possibility because of his complaints he might have a protrusion of an intervertebral disc. Certainly, it was not a full-fledged disc syndrome, but it is a distinct possibility. * * * The great majority of patients with such syndromes, clinical syndromes, do improve and return to active, to full-fledged activity and home life. * * * A much smaller percentage progress and require surgery."

In answer to a hypothetical question embodying claimant's testimony concerning the course of events following the occurrence of March 20, 1952, and prior to the

softball game, the doctor said that at the time of the latter occurrence, claimant had effected a recovery from the former occurrence to the extent that the residual disability amounted to "less than ten per cent. or five per cent.". He further testified that because so many people who have had protruded discs get well, it is good scientific deduction that the protruded material has receded to where it belongs. He stated that even patients who have demonstrable defects on myelograms, the most conclusive evidence, have gotten well without surgery. In answer to a hypothetical question relating to what transpired during the softball game, the witness expressed the opinion that claimant sustained a second injury to his back on that occasion. He stated:

"Certainly the softball incident that you have described fully qualifies as a second injury and the second injury would be the result of the activity being carried on at the time of the softball incident. The condition which was present at the softball incident as a result of the accident of March 20, 1952, would lend some predisposition to the re-injury. * * * It is probable or possible he could have gone the rest of his life without exacerbation of the disc. * * * The softball incident was a definite positive injury to claimant's back."

The referee found that claimant had suffered a permanent partial disability to the extent of twenty-five per cent. of the body as a whole, and attributed such disability to the accident of March 20, 1952. In his "additional findings" the referee found: "That on August 3, 1952, the employee, while playing softball at a family reunion in Decatur, Illinois, again became disabled by virtue of pain in his back and left leg. That the employee did not sustain an accident on August 3, 1952, but that the pain in his back and leg on said date are related to and came about because of the disabled condition of employee's back rendered so on March 20, 1952."

On review, the Commission modified the award of the referee by reducing the percentage of disability to fifteen per cent. of the body as a whole, and attributed such to the accident of March 20, 1952. Thereafter, claimant filed a motion requesting the Commission to make the following special findings:

"1. What per cent. of a man as a whole was the employee permanently disabled on the day of the award, December 18, 1953?

"2. How much of the disability found in '1' above was due to the accident of March 20, 1952?

"3. If all the disability found in '1' above is not due to the accident of March 20, 1952, what is the cause of the other disability?

"4. Does the Commission accept and affirm the 'additional findings' of the referee?

"5. Was the softball incident of August 3, 1952, an accident within the meaning of the Workmen's Compensation Law [V.A.M.S. § 287.010 et seq.]?"

Thereafter, the Commission made additional findings as follows:

"We find from all the evidence that John B. Oertel, employee herein, sustained an accident March 20, 1952, arising out of and in the course of his employment with John D. Streett and Company, Inc., resulting in fifteen (15) per cent. permanent partial disability of the body as a whole (15% of 400 weeks, or 60 weeks).

"On December 28, 1953, the employee, by his attorney, Thomas L. Sullivan, filed a motion requesting the Industrial Commission to make special findings in this case.

"The Industrial Commission has taken up and considered said motion and the questions contained therein. The Industrial Commission is unable to answer questions 1, 2 and 3 propounded in said motion for the reason that there was no evidence in this

cause as to the extent of the disability of the employee on December 18, 1953. In answer to questions 4, 5 and 6, the Industrial Commission makes the following findings:

"We further find from all the evidence that a new, independent and intervening cause or condition brought about by John B. Oertel's engaging in a baseball game on August 3, 1952, for his own recreation, was the proximate and intervening cause, re-injuring or aggravating his back and body. Therefore, said subsequent injury is not compensable and the Industrial Commission refuses to determine the per cent. or extent of disability caused by said baseball game as calling for an unnecessary act upon the part of the Industrial Commission."

As heretofore stated, the circuit court reversed the award of the Commission and entered judgment in accordance with the findings of the referee. A memorandum filed by the court discloses that its action was based upon the view that what occurred during the softball game did not constitute a new, independent, and intervening cause disconnected from claimant's employment.

The sole point made by appellants is that the trial court erred in setting aside the award of the Industrial Commission and in entering judgment in favor of claimant in accordance with the findings of the referee. In support of this assignment it is urged that there was sufficient competent evidence from which the Commission could reasonably have found that as a result of the accident of March 20th claimant suffered a permanent partial disability to the extent of only fifteen per cent. of the body as a whole, and that the injury received on August 3rd was the result of a new, independent, and intervening cause which was not compensable for the reason it did not arise out of or in the course of his employment. On the other hand, claimant contends that the Commission's finding of disability in the amount of only 15% is not supported by competent and substantial evidence, and is clearly contrary to the overwhelming weight of the evidence. It is also urged by claimant that in finding that the softball incident was a new, independent and intervening cause, the Commission has failed to follow the principles announced by the Supreme Court in Manley v. American Packing Co., 363 Mo. 744, 253 S.W.2d 165, 169.

■ Whether a subsequent incident or accident is a part of a continuous chain of causation flowing from the original accident, or is an independent intervening agency, is a question of fact to be determined in each case by the Commission. If there is competent and substantial evidence on the whole record in support of the conclusion reached, the Commission's finding will not be disturbed on appeal. As an aid in determining this fact question, our Supreme Court, in Manley v. American Packing Co., supra, has adopted the following principles pronounced in Schneider on Workmen's Compensation, Vol. 6, page 53:

" 'The chain of causation means the original force and every subsequent force which it puts in motion. If an accident causes an injury and that injury moves forward step by step, causing a series of other injuries, each injury accounting for the one following until the final result is reached, the accident which set the first injury or force in motion is responsible for the final result. It is immaterial that the final result might not ordinarily be expected. It is enough if the injury in a given case did produce the final injury or death.' "

The Supreme Court, in Manley v. American Packing Co., supra, also quotes with approval the following excerpt from 71 C.J., sec. 390, pp. 635–636:

" 'Thus injuries which follow as legitimate consequences of the original accident are compensable, and such accident need not have been the sole or direct cause of the condition complained of, it being sufficient if it is an efficient, exciting, superinducing,

concurring, or contributing cause; thus it is immaterial whether or not a disability results directly from the injury or from a condition resulting from the injury. So, also, if the resultant disability is directly traceable to the original accident, the intervention of other and aggravating causes by which the disability is increased will not bar recovery. The inquiry as to whether the result is the natural and probable, or a normal or abnormal one, is immaterial.' "

Claimant did sustain an injury on March 20, 1952, as the result of an accident arising out of and in the course of his employment. As a result of that accident he suffered a disc injury. The exact nature of that injury was uncertain. It was either a ruptured disc or a protruding disc. A determination of its character depends upon the evaluation of the medical testimony and a consideration of the evidence relative to claimant's activities and symptoms subsequent to March 20, 1952.

According to the medical testimony, it is possible for a protruding disc to be forced back into its normal position through manipulation or change in posture. In that event, the symptoms are relieved and, according to Dr. Hampton, the great majority of patients with such clinical syndromes return to full-fledged activity.

Claimant experienced considerable pain between March 20th and the date he left the employ of Streett & Company. However, he stated that during those eight or nine weeks his condition improved. While working at Woodtreating Company he was better able to do heavy lifting than he was during April and May. He discarded his belt when he left Streett & Company. Several times during June he felt slight pain in his back, and a tingling in the leg. In July, he had no pain.

From the foregoing evidence the Commission could reasonably have found that on March 20, 1952, claimant suffered an accident which caused a protruding disc; that the disc through treatment had re-

turned to its normal position, and that claimant had recovered to the extent that he was able to engage in the normal activities of his work.

Claimant thereafter engaged in the softball game. He was playing near the shortstop position. A ball was hit in his direction and he fielded it. He made three quick steps forward, stooped to pick up the ball, and threw underhanded across his body to first base. In doing so, there was a twist of his body. As he straightened up he experienced severe pain in his back. Since the pain followed immediately after this unusual activity, the Commission could have reasonably found that the pain resulted from injury to claimant's back caused by the force exerted in fielding the ball. The force was not put in motion by the previous accident. Claimant was not caused to slip, fall or twist his body by reason of any weakness in his back due to the prior accident. The force exerted was the result of his own voluntary act, and not a part of a continuous chain of causation flowing from the original force.

■ An injury following a second incident or accident may, under the rule approved in the Manley case, supra, be the legitimate consequence of the first accident if it results from or is contributed to by a condition brought about by the first accident. Whether this is so is also a question of fact for the Commission, to be determined from all the facts and circumstances in the case.

■ The finding of the Commission must be sustained whenever there is any reasonable theory evidenced in the record on which its conclusion can be upheld. It must also be borne in mind that the burden in such cases rests upon the employee to show by a preponderance of the evidence that his incapacity subsequent to the second incident or accident resulted from the original injury. The Commission has, in effect, held that claimant did not sustain that burden in this case, and that the injury sustained on August 3rd was not brought about by a condition resulting from the

first accident. Such finding is implicit in the Commission's ruling that said injury was the result of an intervening cause. We believe there was ample evidence in the record from which the Commission could have reasonably made its finding.

What we have said is in no way opposed to the ruling in Manley v. American Packing Co., supra. In that case there was a finding by the Commission in favor of claimant. That finding was upheld on appeal for the reason that the evidence justified a finding that the second accident itself was caused by the injury resulting from the original accident; and that the fatal embolism which followed was, in fact, the legitimate consequence of the force put in motion by the first accident.

The facts in the case at bar are more nearly analogous to those in Hager v. Pulitzer Pub. Co., Mo.App., 17 S.W.2d 578, cited by our Supreme Court in the Manley decision. On the authority of the Hager case, and under the principles announced in the Manley case, we feel compelled to sustain the finding of the Commission on the issue of causation presented by the record in the case at bar.

The Commission found that the extent of disability arising from the accident of March 20, 1952, was 15 per cent. of the body as a whole. Appellants contend that there was sufficient evidence to support such finding, while respondent says that it is against the overwhelming weight of the evidence.

Dr. Wennerman gave it as his opinion that claimant's disability was about 40 per cent. of the man as a whole. This estimate was, of course, based on the supposition that all of claimant's disability was caused by the first accident. Dr. Hampton testified that it would be speculative to give a figure as to claimant's disability prior to the softball game, but said: " * * * if I had to put on a figure, I would say it was a pretty low percentage, less than 10 per cent. or 5 per cent. disability residual."

The Commission also had before it all the testimony of the medical experts, and the testimony of claimant himself concerning his physical condition between the date of the first accident and the date he participated in the softball game. From all this evidence the Commission was entitled to reach its own conclusion as to the percentage of disability. Worley v. Swift & Co., Mo.App., 231 S.W.2d 828; Henderson v. Laclede Christy Clay Products Co., Mo.App., 206 S.W.2d 673; Johnson v. Fogertey Bldg. Co., Mo.App., 194 S.W.2d 924, and Barron v. Mississippi Lime Co., Mo.App., 285 S.W.2d 46. We have carefully reviewed this evidence and have concluded that the finding of the Commission with respect to the percentage of disability sustained by claimant is supported by competent and substantial evidence.

Respondent complains of the action of the referee in admitting certain testimony over respondent's objection. Ordinarily a party not appealing will not, for the purpose of modifying in any manner the judgment in his favor, be heard to urge a review of errors committed against him. However, he may, for the purpose of sustaining the judgment in his favor, attack rulings made below which are erroneous. St. Charles Savings Bank v. Denker, 275 Mo. 607, 205 S.W. 208. But, to do so, there must be a proper assignment of errors.

Respondent's assignment in the case at bar recites:

"The referee and commission erred when they permitted the physicians in the case to give opinions on whether the incident of August 3, 1952, was or was not an accident or new injury, said opinions being legal conclusions and usurping the function of the referee and commission as to what is and what is not accident and injury."

This assignment is wholly inadequate.

We think the failure to set out with more particularity the evidence alleged to have been improperly adduced, by specifying the names of the witnesses so testifying, and by giving the page of the record where such testimony is to be found, ren-

ders said assignment insufficient, under the authority of School Dist. of Kansas City v. Phoenix Land & Improvement Co., 297 Mo. 332, 249 S.W. 51.

■ It is also urged that the Commission erred in refusing to find:

"1. The amount of permanent disability the employee had at the time of the award.

"2. The amount of this permanent disability which was the result of the accident of March 20, 1952.

"3. The amount of this permanent disability not the result of the accident of March 20, 1952."

The Commission found that as a result of the accident of March 20th claimant suffered a 15% permanent partial disability of the body as a whole. Having made such finding, no purpose would be served in making a further finding with respect to the disability resulting from the softball incident or the total amount of claimant's disability on the date of the final award.

■ It is further urged that the Commission erred in refusing to specify whether or not it accepted and affirmed the "additional findings" of the referee. The Commission made its own findings which fully covered the issues tried. These findings, as well as the findings of the referee, were filed in the case and are in the transcript. From a comparison of the two it can be readily ascertained wherein the Commission differed from the referee. No useful purpose would have been served by the Commission making a detailed analysis of the differences between the two findings.

■ Respondent next urges that the Commission erred in refusing to find whether or not the softball incident was an accident, and whether or not it had any effect on the employee's condition. It is immaterial whether the agency which produces a second injury is the result of accident or is the result of a voluntary act on the part of claimant or another. Therefore, the Commission did not err in refusing to specify whether claimant did or did not sustain an accident on August 3, 1952. That the incident of August 3rd did affect his condition was specifically found by the Commission.

■ Nor can we consider the respondent's final contention that he is entitled to interest on each installment of compensation from the date when due until paid, even though appellants have deposited into the registry of the trial court the sum due under the Commission's award. The trial court has made no ruling with respect to this matter.

The judgment of the circuit court is reversed and the cause is remanded with directions to the trial court to enter up a new judgment affirming the award of the Commission.

RUDDY and MATTHES, JJ., concur.