**Guy Daniel SMITH, Appellant,**

v.

**COOK PAINT & VARNISH CO. and the Travelers Insurance Company, Respondents.**

**No. KCD 29045.**

Missouri Court of Appeals, Kansas City District.

Jan. 30, 1978.

Thomas M. Howell, Kansas City, Elwyn L. Cady, Jr., Independence, for appellant.

Gary E. Lowe, Jack B. Robertson, Rogers, Field, Gentry, Benjamin & Robertson, Kansas City, for respondents.

Before SHANGLER, P. J., and WELBORN and HIGGINS, Special Judges.

SHANGLER, Presiding Judge.

The employee Smith made claim against employer Cook Paint and Varnish Company for accidental injury to the eye and other bodily functions from exposure to anhydride chemicals. The Industrial Commission denied benefits, the circuit court affirmed, and the claimant appeals.

At the time of the event, the employee was a foreman and had worked in the resin manufacture department for more than twenty-five years. The product was made from a process in which phthalic and maleic anhydrides in solid form were liquefied and pumped at high temperature under pressure through a system of pipes to kettles to be cooked.

In the early morning of January second, one of the pumps in the phthalic anhydride system malfunctioned from leakage of the chemical which solidified around the pump. It was a recurrent phenomenon which the claimant had confronted many times before. The pump was located in a tunnel in the basement. The claimant entered the tunnel to free the machine but was enveloped in clouds of phthalic crystals and so had to remove the face mask he wore in order to proceed with his work. After an effort of about twenty minutes, the claimant withdrew from the tunnel, but then returned for another five minutes to conclude the task. An hour later he became nauseated and developed chest pains. Then, during the week he began to develop pains in the thighs and calves of his legs.

The claimant assumed his trouble was arthritis and sought medical treatment for that malady. He was treated for that condition by medication first by one doctor and then another. His leg complaints did not

abate, so the claimant was admitted to the Veterans Hospital where he remained from February 26th until March 7th. A biopsy of the calf muscle diagnosed his condition as polymyositis. During that internment he experienced an occasional loss of vision in the left eye. On May 14th, after the claimant had returned to work, and while on a regular shift he suddenly and painlessly lost the sight of his right eye. He consulted Dr. Deligeorges who diagnosed the condition as a central retinal occlusion.

The main issue before the Industrial Commission was whether the exposure to either or both of the anhydrides—phthalic or maleic—was a cause of the central retinal occlusion. It was the theory of the claimant that the exposure to these chemical fumes was an accident which aggravated a preexistent collagen disease [malady of the connective tissue] and resulted in the central retinal occlusion in his right eye.

The first point on appeal contends that the Industrial Commission applied an erroneous standard of causation to deny compensation. This contention focuses upon one finding by the referee adopted by the Industrial Commission:

> I have been unable to find the necessary convincing evidence that the two chemical substances known as phthalic anhydride . . . and maleic anhydride . . . were the medically competent producing cause of the injuries sustained by the Claimant solely as a result of the exposure on the second day of January, 1970.

The claimant contends that this finding discloses the referee [and the Commission] found only that the exposure to the chemicals was not the *sole cause* of his blindness but failed to consider whether or not, in concurrence with the pre-existent collagen disease, it was a contributing cause of the injury.

The law compensates industrial injury which follows as a legitimate consequence of an accident. An accident need not be the sole or direct cause of injury to be compensable; it is enough that the accident be "an efficient, exciting, superinduc-

ing, concurring or contributing cause." *Manley v. American Packing Co.*, 363 Mo. 744, 253 S.W.2d 165, 169[3] (Mo.1952). Thus, it is immaterial to recovery that a particular disability was not expected from an accident or cannot be directly traceable to that event. It is enough if the accident produced the final injury. Inquiry as to whether the result was natural or probable does not properly arise. *Fielder v. Production Credit Association*, 429 S.W.2d 307, 316[16, 17] (Mo.App.1968). This legal conclusion of cause and effect, of course, ordinarily depends upon evidence of medical cause given by physician witnesses, and on this claimant bears the burden of proof. *Griggs v. A. B. Chance Company*, 503 S.W.2d 697, 704[6] (Mo.App.1974).

The findings of the Commission on the evidence are to be read as a whole and so as to validate the award where such a construction is reasonable. 100 C.J.S. Workmen's Compensation § 636, p. 936. A fair understanding of the findings made by the referee and adopted by the Commission imports the decision that claimant failed to prove that the exposure of January second to the anhydrides, phthalic and-or maleic, produced the retinal occlusion, either by direct cause or as an aggravation of the pre-existent collagen disease. The term *solely* which the claimant indicts antecedes "as a result of the exposure on the second day of January" and does not bear on the precedent "medically producing cause of the injuries." That term, taken in the context of decision and award, does not express a standard of medical cause but merely determines that legal cause for the injury was not shown. Put simply: the claimant did not prove that the injury was caused by the employment. This surmise is confirmed by the four successive findings which evaluate that the physician testimony did not prove medical causation between the exposure and the injury.

The claimant argues also that the term "necessary convincing evidence" employed in the finding to deny compensation demands a more rigorous proof than the mere preponderance of the evidence the law actu-

ally imposes. The claimant cites § 2498 of the Wigmore treatise. That same section [pp. 325–326] acknowledges that proof which "satisfies" or "convinces" is used in decisions as equivalents of proof by a "preponderance."

The second point on appeal contends that the award of the Industrial Commission which denied compensation was not supported by substantial and competent evidence. The claimant excerpts a pastiche of testimony to show that his witness Nichols, forensic pathologist, gave the only competent expert evidence on the issue of causation—and to show, also, that the employer witnesses either gave opinion on imperfect premises, or were altogether biased.

■ As to the contention of qualification for opinion, the claimant insists that employer witness, ophthalmologist Deligeorges, had not seen a case where a pre-existent collagen disease, exposure to anhydrides, and central retinal occlusion coincided, and so could not express a valid conclusion as to causation. It is clear, however, that witness Nichols for the claimant admitted that neither had he. The claimant also contends that the testimony of employer witness Kelly, Medical Director for Monsanto Chemical Company, was biased towards producers of chemicals, and that his opinion was in any event, a response to a contrived and imperfect hypothetical question. The claimant does not suggest any particular bias of motive or inadequacy of examination. As to the first criticism, the assessment of ulterior motive or other credibility of the witness, of course, rests with the trier of fact, and not with this court [*Williams v. S. N. Long Warehouse Company*, 426 S.W.2d 725, 733 [5–9] (Mo.App.1968)]; as to the second, the point is not preserved for review.

The evidence of medical causation came from three witnesses. The ophthalmologist Deligeorges, who treated the claimant for his loss of vision, testified for the employer that his opinion, on reasonable medical certainty, was that there was no causal relationship between the exposure to the anhydrides and the retinal occlusion—even on the assumption that there was a subsistent collagen disease process, which he denied. Dr. Kelly testified that the anhydrides were irritants to the nose, eyes and chest—especially when inspired in concentrated form or as hot fumes. In his almost forty years of experience in the treatment of exposure to maleic and phthalic anhydrides, he had never seen a single case of central retinal arterial occlusion in any employee. Nor had he ever heard of an aggravation of rheumatoid arthritis or polymyositis by exposure to these chemicals. His search of the Toxicon Computer Network, a data bank of medical periodicals for the past twelve years, disclosed no connection between anhydride chemicals and polymyositis or central retinal occlusion. The witness concluded with the opinion that there was no causal relation between the exposure of the claimant to the anhydrides and his visual and muscular disabilities.

The claimant relies on the testimony of pathologist Nichols for the proof of causation. The direct examination elicited only that "on the predicate you have laid there is probably a reasonable probability of cause and effect." Cross-examination disclosed the uncertain basis for even this opinion. He admitted that the causes of the collagen disease process are not known, and named four specific stimuli which aggravate that condition—the anhydrides not among them. He admitted also as to no specific knowledge of the chemical properties of the anhydrides and that the basis for his claim that the chemicals are noxious was the warning printed on the bottles in the chemical department. He admitted also that he knew of no case where the anhydrides were a causative factor in a central retinal occlusion or contributed to the blindness of someone with a pre-existent collagen disease.

This evidence, taken most favorably to the decision of the Commission, reasonably supports the denial of compensation. The judgment is affirmed.

All concur.