Joseph S. COPE and Lucia G. Cope,
Plaintiffs-Respondents,

v.

John C. BELTRAM and Opal L.
Beltram, Defendants-Appellants.

No. KCD 29252.

Missouri Court of Appeals,
Western District.

Feb. 4, 1980.

Robert M. Hill, David L. Busch, Hill &
Miller, P. C., Richmond, for defendants-appellants.

William Aull, Aull & Sherman, Lexington, for plaintiffs-respondents.

Before DIXON, P. J., and TURNAGE
and KENNEDY, JJ.

DIXON, Presiding Judge.

The trial court, sitting in equity without
a jury, found the issues for the plaintiffs
and decreed that the division line between

the plaintiffs' and defendants' lands was as described in the respective deeds of the parties. The plaintiffs were ordered to construct, at their expense, a division fence in accordance with a specified survey under the supervision of the surveyor. The defendants appeal.

Because of the divergent views of the parties, both as to factual matters and legal theory, the issues may not be pithily stated. Generally, however, the defendants' appeal raises issues of the viability and appropriateness of plaintiffs' pleadings, the correctness of the trial court's establishment of the property line on the basis of the survey relied upon, and a claim of adverse possession.

At the outset, it must be stated that, based upon all the evidence and exhibits, the trial court's determination of the legal description of the division line and the physical location of the description on the land is beyond dispute.[1] There is simply no substantial evidence to the contrary.

Turning now to the factual matrix disclosed by the record, the parties acquired their title to adjoining tracts from the County Court of Lafayette County in 1954. Both tracts—each described portions of Lot 16 of Farmer's Bank Subdivision of Gratz Place, a subdivision of Lexington, Missouri—are a portion of the river bluff overlooking the Missouri River. The record intimates a close proximity to the Civil War battlefield located in Lexington. The general area is referred to as "The Point" and is apparently a prime residential area. Both plaintiffs and defendants have constructed substantial residences on their respective properties. Although each tract of the parties consists of more than an acre, only 25–30 feet separates the residences at the closest point of proximity of the structures.

The subdivision in which the lands are located is of ancient vintage. Lot 16 embraces several acres and other described tracts. All of the deed descriptions reference the recorded plat in Plat Book 1, page 19, of the deed records of Lafayette County. The surveyor's sketches and plats reveal the presence of a dead end public road traversing Lot 16 northwesterly from 17th Street in Lexington to a common corner of the parties. The common corner of the parties is at the point where the center line of the public road terminates on the common property line of the parties. This point is marked by an iron pin which was not only verified by the prolongation of the center line of the public road and the closure of the metes and bounds description at the same point, but also by the admissions of the parties.

Two surveyors testified in the case. One of them testified that he set the iron pin to replace a wooden stake he had set when laying out the parties' lands by survey when the county conveyed the land. At the time of trial, this surveyor was the County Surveyor of Lafayette County. The survey made in 1954 by that surveyor was in evidence, and it coincides with his later survey and that of the other surveyor who testified.

Both deed descriptions begin at a common point on the northwesterly line of Lot 16. The descriptions then proceed from the point of beginning and in opposite directions by metes and bounds and then, by those metes and bounds, returning to the point of beginning. The descriptions close at the common point of beginning, a matter determinable by mathematics.

That the common boundary of the parties coincides is also mathematically verifiable since the call and distance of each description on the common boundary is the reciprocal[2] of the other and the line begins at a commonly-described point and terminates at the point agreed to in the center line of the roadway. Additional verification for the fact that no gap or overlap exists between the properties on the common line is

---

1. There is a clerical error in the description in the decree which will later be noticed.

2. The expression, a reciprocal, as applied to land descriptions refers to a course along the same line, but in the opposite direction. Thus, N 15° E and S 15° W are reciprocals.

found in the fact that the calls for course and distance as to the northwesterly and southeasterly boundaries of both parties are also reciprocals. This fact demonstrates beyond any doubt the nonexistence of any gap or overlap between the descriptions.

The physical location of the descriptions on the ground is likewise without doubt. The surveyors agree, one on the basis of his two surveys separated by twenty years lapse of time, the other by an independent survey close to the time of trial.

The difficulty, as is often the case in land disputes, lies in the efforts of the parties to erect, without professional advice, a fence marking the division line. Aside from the testimony of the professional surveyors whose testimony was succinct because of any lack of disagreement, the record is replete with vague and confusing testimony concerning the existence and location of various fences on or near the common boundary.

The defendants offered evidence that a fence of iron posts and wire was established in 1954 at or near the time of the acquisition of title. The location and removal of this fence remains uncertain in the record. Defendants assert "somebody came in at night and took the fence away."

Thereafter, and shrouded in some uncertainty as to location and length, a rustic wood fence was constructed by the defendants. As best as may be gleaned from the evidence, a post and rider type fence was built along the same general lines as the prior iron post and wire fence.

The fence unquestionably began at the intersection of the public road and the property lines and ran northwest at least as far as the crest of the bluff. The defendants contend the length of the fence was that of the common boundary—272 feet. The defendants admit, however, the fence beyond the crest of the bluff was "three hedge posts with wire" until three years prior to trial when it was "finished up down the hill."

It is a fair statement from the whole record that, for 155 feet from the public road northwesterly, the location of the various fences has coincided with the common boundary line. From that point northwesterly "over the hill" to the rear of the parties' property, the fences have traversed rough, brushy ground and, as the plaintiffs contend and the surveys show, encroach on the plaintiffs' described premises. The encroachment is slight considering the size of the property involved. It has resulted, however, in various frictions far out of proportion to the value of the disputed area.

The record is replete with evidence of what might be termed the "pushings and shovings" of the parties in the disputed area. A detailed statement of these difficulties is unnecessary, but the dispute has been fueled by these bickerings. The dispute finally entered the courts by way of a petition filed by plaintiffs. The petition sounded in trespass but prayed for general equitable relief. The defendants filed an answer asserting adverse possession to the fence line and generally denying plaintiffs' claim. This occurred in October, 1975 to January, 1976. In August, 1976, a stipulation *and* survey was filed. Omitting the caption, it is as follows:

"It is stipulated and agreed by JOSEPH S. COPE and LUCIA G. COPE, husband and wife, First Parties, and JOHN C. BELTRAM and OPAL L. BELTRAM, husband and wife, Second Parties, that

WHEREAS, a dispute exists between undersigned Parties as to the correct division line between property owned by them on the "Point" in Lexington, Missouri, and the Parties desire to get the entire matter resolved;

NOW, It is by the Parties agreed that HALL & CULLOM survey or establish the division line between said properties in accordance with the deeds to said Parties, now of record in the Lafayette County Recorder's office, and further that said Parties agree to abide by the line as so established by the surveyors as the correct boundary line between their respective properties; and that each par-

ty further agrees to pay one-half (½) of the cost of said survey.

s/ Joseph S. Cope
s/ Lucia G. Cope
First Parties
s/ John C. Beltram
s/ Opal L. Beltram
Second Parties"

This stipulation was in accordance with an agreement between the lawyers then in the case and the parties. Pursuant to that survey and stipulation, the plaintiffs employed one Neal to build a fence according to the survey. This occurred in the latter part of August, 1976. The fence was completed despite what Neal referred to as a "little profanity" from Mrs. Beltram, one of the defendants. The fence was set 6" on the plaintiffs' side of the line. This fence was destroyed while plaintiffs were out of town by an automobile being driven against the fence by some person not identified in the record. Plaintiffs do not claim the defendants caused the damage. Plaintiffs' efforts to reerect the fence were met with such resistance from the defendants that the effort was abandoned.

On August 25, 1976, defendants' present counsel entered his appearance, filed a motion to set aside the stipulation, and set the cause for trial. Aside from setting the cause for trial, the court never made any order concerning the defendants' motion, although it was noticed for hearing. A few days before the hearing, counsel, who had represented defendants when the stipulation was filed, withdrew from the case. Trial then followed in December, 1976.

Pivotal to a determination of the issues later to be discussed is the stipulation and survey conducted pursuant to the stipulation. The trial court never having ruled the issue on defendants' motion and defendants never having pressed the court for a ruling, the issue would ordinarily pass out of the case and the stipulation be for all purposes binding on the parties. *Oertel v. John D. Streett & Co.*, 285 S.W.2d 87 (Mo.App.1955); *Coleman v. Reynolds*, 207 Mo. 463, 105 S.W. 1070 (1907). The plaintiffs, however, offered the stipulation in evidence, and the defendants objected. The court admitted the stipulation in evidence. That ruling by the trial court is not contested on this appeal. Thus, the stipulation was in evidence properly identified as to signatures and the circumstances of its execution.

The effect of such a stipulation on the issues between the parties is demonstrated in a case with remarkably similar facts and such a stipulation. *White v. Herminghausen, et al.*, 275 Mo. 687, 205 S.W. 624 (1918). Such a solemn judicial admission by the parties should ordinarily serve to end the dispute, as the court held in *White*. Such a stipulation, again in a boundary line dispute, has been held to be an enforceable agreement to settle and compromise subject to the equitable remedy of specific performance. *Dewitt v. Lutes*, 581 S.W.2d 941 (Mo. App.1979). Because of the long, rancorous dispute and the necessity to terminate finally, and without further litigation, all issues between these parties, the claims of error raised by defendants will be considered and decided.

■ Defendants first assert error in the failure of plaintiffs to allege and prove the lack of an adequate remedy at law justifying the interposition of equity. The defendants cite cases supporting the abstract proposition asserted in the brief, but in connection with cases involving injunctive relief. The trial court here gave no injunctive relief. The evidence went in without objection on the issues of title and location of the boundary. The case was tried and the decree reflects a determination of the rights of the parties under the deeds, declares those rights, and provides a practical remedy to enforce the rights and end the dispute. It would be entirely logical and proper to approve the trial court judgment as a specific enforcement of the stipulation of the parties in view of the evidence adduced and the court's decree. *Dewitt, supra.*

■ Defendants next assert the trial court erred "in finding that an injunction does lie to stop a repeated trespass" and further that "injunction will (not) lie as an original and independent suit to try title." What has heretofore been stated is again a

sufficient answer to this contention. The case was simply not tried as an action for injunction nor, indeed, as trespass, although there is undoubtedly evidence relating to various incursions into the plaintiffs' land by defendants or their agents.

■ Defendants next object to the trial court's action in admitting the July, 1976 survey made pursuant to the stipulation. Defendants correctly assert the survey makes no reference to a commencement point at a corner established by the government or reestablished in accordance with the statutes for reestablishing such corners. Again, there can be no quarrel with the principle stated, nor the cases cited applying the rule. The problem is, again, the lack of any proper procedural step to preserve the error. The surveys were offered and received in evidence without any objection by defendants to raise the issue concerning the lack of evidence of the survey commencing at a government corner. Defendants on cross examination did, in fact, establish the surveys did not commence at a government corner by questions addressed to the surveyor. Even then there was no motion to strike nor any request to determine the admissibility of the evidence.

In view of the fact that the survey did begin at an agreed point in a subdivision lot line and that the subdivision plat had been of record since the time of the Civil War, it may be said of this claim, as of a similar one in *Donze Lake Development v. Holliday*, 588 S.W.2d 251 (Mo.App.1979):

> "Defendants' final point is that the trial court erred in admitting the testimony of plaintiffs' surveyor because he did not begin his survey at an established government monument. We have difficulty understanding what prejudice arose from this claimed error inasmuch as the description of the property was stipulated to. Further, the defendants' surveyor compared the survey he prepared with that of plaintiffs' surveyor and indicated they appeared to show the same area in dispute." *Id.* at 253–54.

The whole point of requiring objections at the time of introduction of the evidence is here demonstrated. If defendants had made such a proper objection to the surveys and the surveyors' testimony, plaintiffs would have been compelled to bring in the evidence supporting the survey, which would appear to have been available, or have foregone the benefit of the evidence.

Finally, the defendants claim in an inverse fashion the benefit of adverse possession. This claim is predicated upon the evidence of the location of the fence or fences on or near the boundary. Defendants claim that they were in possession of any tract of land which their post and rider fence enclosed and to which the plaintiffs were record title holders. The cases cited in support of this argument are *Crane v. Loy*, 436 S.W.2d 739 (Mo.1968) and *Tillman v. Hutcherson*, 348 Mo. 473, 154 S.W.2d 104 (1941). Both of the cited cases are cases in which the agreed boundary line doctrine is involved.

■ Defendants misunderstand the doctrine they seek to apply. *Tillman* is an exhaustive review of the entire doctrine. *Tillman* recognizes that if there be an express agreement, the fence becomes the line, *supra* at 107. No such agreement existed in *Tillman*, and none exists here. *Tillman* then traces the development of the doctrine and squarely holds that when a fence line is claimed as a property line by long acquiescence the fence must exist for the statutory period before the possession becomes *adverse* and thereafter another statutory period must elapse before the adverse use ripens into title, *supra* at 107–108. Thus, under the facts of this case, the *area in dispute* was first fenced in 1959 giving the defendants the benefit of the doubt.[3] Thus, until 1969, the defendants' enclosure of a small part of plaintiffs' land was not *adverse*. The suit was filed before the ten year statute could have caused that adverse possession to ripen into title. *Tillman, supra*. There is nothing in the facts of the instant case which would give rise to an inference that defendants' possession to the

---

**3.** The iron post and wire fence was never extended "over the hill" to the disputed area.

fence was hostile and adverse to the plaintiffs' title prior to 1969. Defendants' assertions are to the contrary; they have steadfastly argued the fence was on the line or, if anything, on their side of the line.

There remains the issue of the misdescription in the decree. It is apparent that the decree omits a proper call and contains surplusage. There is no dispute in the case concerning the correct description to be used in the decree. The judgment of the trial court is affirmed in all respects except the description. The case is remanded to the trial court with directions to insert the correct description and, as corrected, the decree is in all respects affirmed.

All concur.