**Gary PACE, Respondent,**

v.

**CITY OF ST. JOSEPH, Appellant,**

**Treasurer of the State of Missouri— Custodian of the Second Injury Fund, Respondent.**

Nos. WD 74234 to WD 74237.

Missouri Court of Appeals, Western District.

May 22, 2012.

138

Bart Eisfelder, Kansas City, MO, for Appellant.

Benjamin Creedy, St. Joseph, MO, for Respondent, Pace.

Maureen Shine, Kansas City, MO, for Respondent, Treasurer of the State of MO.

Before JAMES EDWARD WELSH, P.J., CYNTHIA L. MARTIN, J., and GLEN DIETRICH, Sp. J.

JAMES EDWARD WELSH, Presiding Judge.

The City of St. Joseph appeals from the Labor and Industrial Relations Commission's determination that Gary Pace was entitled to permanent and total disability benefits for a knee injury he sustained at work on December 9, 2002. The City asserts that the Commission erroneously applied the law regarding the substantial factor test when it found that Pace's employment with the City on December 9, 2002, which resulted in Pace's injuring his right knee, was a substantial factor in causing Pace's injuries to his back, hip, and left upper extremity in 2004. Moreover, the City contends that the Commission's determination that Pace was permanently and totally disabled due to the December 9, 2002 right knee injury alone was not supported by competent and substantial evidence. Further, the City contends that competent and substantial evidence did not support the Commission's determination that Pace's back pain, bilateral carpal tunnel syndrome, complex regional pain syndrome, and chronic reactive depression were a result of the December 9, 2002 knee injury. We affirm.

Pace was employed by the City of St. Joseph as a dangerous buildings inspector. On December 9, 2002, he was inspecting a motel in St. Joseph. As he stood in the middle of a room taking photographs, his right foot became lodged in the floor. Pace's body twisted, and he lost his balance and injured his right knee.

Dr. Bruce Smith diagnosed Pace with a meniscus tear in his right knee and performed arthroscopic surgery on January 10, 2003. Following the surgery, Pace developed a blood clot in his right leg, which required additional hospitalization and treatment. Pace was diagnosed as having deep vein thrombosis in his right leg secondary to arthroscopic surgery and immobility.

After the surgery, Pace still experienced pain underneath his right knee cap and deep inside the knee. Pace said that his knee hurt in the area where the blood clot was (three or so inches below the knee), that his right shin bone hurt, that the skin on top of his right leg was sensitive, that his right ankle felt like a hot wire burning him, that he had pain in the middle of his right calf muscle, and that he had pain in his right instep up to the toes.[1] Pace filed

---

1. As of the date of the hearing, Pace said that he still experiences pain in these areas.

a claim for workers' compensation for the December 9, 2002 incident. His claim listed these body parts as injured during the incident: "Right leg and knee; cardio-pulmonary system (deep vein thrombosis); nervous system; development of."

Pace was off work from December 10, 2002, to April 7, 2003. Upon returning to work, he was initially put on light duty, and he eventually resumed unrestricted, full duty work. Even after returning to work, Pace had significant pain in his knee. According to Pace, it was painful to go up and down steps and to walk on uneven terrain. Standing or walking aggravated the pain in his knee, and the longer he was "up and around" on his knee, the worse the pain got. Anytime Pace put weight on his right leg, his knee would hurt.

The pain was so great at times that Pace would have to go sit in his truck and elevate his leg, or he would simply go home. Every day on his lunch breaks, he would go home, take pain pills, and lie down in bed for 45 minutes with his leg propped on a pillow. Sometimes, Pace did not go back to work after lunch because the pain was so bad. Eventually, the pain got so bad that many times Pace would do building inspections from his truck and take photographs from his truck to avoid having to walk into the buildings. Because of the pain, Pace would have to take off work "a lot of times." Pace used sick leave, vacation leave, and comp time when he took off work, but eventually it got to the point where he would have to take time off without pay.

After work each day, Pace's knee was very swollen, and the pain in his knee would be much worse. Pace would go home, ice and elevate his knee, and take more pain medication. Pace's activities at home were limited to "puttering around the house" for ten to twenty minutes, and then he would have to go sit down in a recliner. Most days, Pace would just get in bed as "quickly as possible" so that he could elevate his leg. According to Pace, the knee pain kept him up at night, and he would usually get only two hours of sleep per night because he was waking up four to eight times a night. Pace eventually began taking sleep medication to help him sleep. He now wakes up on average two to three times a night.

Dr. Smith prescribed a cane for Pace to use while walking. Pace used the cane when he went back to full duty work because his right knee was unstable. According to Pace, the pain in his right leg severely limited his ability to walk, and the pain was so strong and sharp that it caused his right leg to give out at times and would result in his falling. Pace could not walk more than a block or two without the pain reaching intolerable levels. The tendency of his right leg to give out has been present ever since the December 9, 2002 accident.

After the December 9, 2002 accident, Pace experienced several falls. On April 26, 2004, while working at his office, Pace tripped over some electrical cords that were on the floor. While falling, he put his right leg out, putting weight on it, and fell into an employee's lap. The pain in Pace's right leg was "very, very painful," and he missed three days of work because of the pain. Pace did not file a workers' compensation claim for this incident.

On November 2, 2004, Pace was working in his office and was walking to the restroom when he experienced a sharp pain under his right kneecap, which caused his knee to give out and caused him to fall. As he fell, Pace tried to catch himself, but he ended up twisting and spinning which caused severe pain in his right knee. According to Pace, after the fall, his lower back hurt, and the pain in his knee kept increasing. Pace filed a workers' compen-

sation claim for this incident. His claim listed these body parts as injured during the incident: "Back; right leg; right knee; nervous system; left hamstring; brain-mental/emotional; hands; body as a whole."

On December 10, 2004, Pace's right knee gave out as he was walking down stairs while at work. He felt a stabbing pain in his right leg as he was walking down the stairs, and his leg gave out causing him to fall. Pace landed on his left hip and his left elbow, which jerked his left arm up. He then bounced down the rest of the stairs. After the fall, Pace's lower back, left hip, left elbow, left bicep, and left shoulder were hurting. According to Pace, he was hurting so bad after the fall that he laid on the floor for 20 to 30 minutes before he was finally able to stand up on his own with his cane. Pace filed a claim for workers' compensation for this incident. His claim listed these body parts as injured during the incident: "Back; right leg; right knee; left shoulder; left hip; left hamstring; brain-mental/emotional; hands; body as a whole."

Because of the left shoulder injury, Pace cannot lift with his left arm, and his range of motion is limited. Pace said that the left shoulder is still very painful. According to Pace, the lower back pain starts in the center of his spine and radiates out to the right. Any activity makes the pain spread out further in his back. The back pain affects his activities, and, if he moves wrong or bends more than two times, the pain starts up. When Pace has these flare ups, he has to sit down in the recliner, prop his legs up, take pain medication, and wait until the pain subsides.

On December 17, 2004, Pace was working when a large dog jumped up on his back and caused him to stumble and to fall forward. Pace caught himself on his cane and landed on one or both knees. After this fall, Pace just got back up and went back to work. According to Pace, after this incident, he hurt a little bit but "not real bad." Pace filed a claim for workers' compensation for this incident. His claim listed these body parts as injured during the incident: "Back; right leg; right knee; nervous system; brain-mental/emotional; hands; body as a whole."

On December 21, 2004, Pace was getting into his work truck, and, when he grabbed the steering wheel, he felt his left shoulder pop. Pace had increased pain in his left shoulder, but, after an hour or two, the pain started easing up. Pace still has pain in his left shoulder after this incident. Pace did not file a claim for workers' compensation for this incident.

The City of St. Joseph terminated Pace's employment on February 5, 2005, citing poor work performance.

Before the December 9, 2002 accident, Pace engaged in a lot of hobbies such as golf, racquetball, tennis, pool, roller skating, scuba diving, hiking, fishing, biking, automobile repairs, and practicing karate with his son. According to Pace, he no longer participates in these activities. Pace is able to wash dishes and dust at home, but these activities aggravate his pain. He has tried vacuuming on three or four occasions, but vacuuming is very hard on his back and right leg. When he grocery shops, Pace rides in an electric cart and has to put the grocery bags in a two-wheeled cart to get the groceries from the car to the house. Since the work accidents, he spends most of his days sitting in a recliner reading books and watching television. He no longer drives and depends on his wife to take him places.

Pace experiences pain in his right knee 24 hours a day, 7 days a week. His right leg changes color from purple to red; his skin is sensitive around the knee; his knee

swells; and his right leg feels a few degrees warmer than the left leg at times. Pace has had lower back pain since the November 2, 2004, and December 10, 2004 incidents. He sleeps in a recliner due to his left shoulder, back, and right leg pain. According to Pace, he takes medication all day long for the pain. The medication causes dizziness and makes Pace unstable. Pace has trouble showering because it is difficult for him to move his left arm due to the limitation of motion and pain in his left arm. If Pace lifts his arm too high, he experiences a lot of pain. Moreover, lifting, bending, walking, and standing for more than fifteen minutes causes him pain. When he walks for extended periods of time, Pace's right leg swells.

According to Pace, he has also become depressed and takes medication for the depression. Pace is depressed mostly about poverty, not having a job, and not having any job prospects. He started taking medication for depression after he was fired by the City.

When Pace started using a cane to walk, he held it in his right hand, but holding the cane in his right hand became painful. So, he began alternating the cane between his left and right hands. He then started experiencing pain in both hands, which would be a solid, constant pain that would get sharp if he gripped or held anything. According to Pace, he would alternate the cane between hands, and, when one hand would become numb, he would either drop the cane or feel like doing so. Pace said that he did not have hand pain like this before using the cane. He was ultimately diagnosed with carpal tunnel syndrome in both hands and underwent surgery on

both sides. He started using Canadian crutches in 2006 and uses one for each side.

The Division of Workers' Compensation Administrative Law Judge (ALJ) held a hearing on July 28, 2010, on Pace's four claims for workers' compensation. After a hearing, the ALJ determined that Pace sustained injuries by accident on December 9, 2002, which arose out of and in the course of his employment, and that the December 9, 2002 accident was a substantial factor in causing both Pace's resulting medical condition and his disability. In particular, the ALJ found:

I find the ... December 9, 2002 accident resulted in [Pace's] right knee to become weak and unstable, and caused his right knee to give out on him at times. I find his right knee gave out on him on November 2, 2004 and on December 10, 2004 because of the December 9, 2002 accident, and that [Pace] sustained additional injuries on November 2, 2004 and December 10, 2004 in the course of his employment for Employer. I find that the injuries [Pace] sustained on December 9, 2002, November 2, 2004, and December 10, 2004 resulted in permanent and total disability, and that [Pace's] resultant permanent total disability is directly traceable to his December 9, 2002 accident. I find that the injuries [Pace] sustained on November 2, 2004 and December 10, 2004 followed as natural and legitimate consequences of the original accident on December 9, 2002. I find the falls on November 2, 2004 and December 10, 2004 were not separate and distinct injuries from the December 9, 2002 injury.[2]

2. As for the claim involving the December 17, 2004 incident where the dog jumped on Pace's back, the ALJ found that Pace sustained an accident on that date in the scope of his employment and that the accident caused soreness to his back and right leg. The ALJ concluded, however, that Pace did not sustain any significant injury from this accident. The ALJ stated that it did not find Dr. Koprivica's disability ratings relating to this incident to be

I find that [Pace] has met his burden to prove that he sustained an injury that was clearly work related, and that his work for Employer was a substantial factor in causing injury to his right lower extremity, back, left shoulder, right and left wrists, depression, and chronic pain, and resulting disability. I find that [Pace] sustained a compensable accident on December 9, 2002 that resulted in injury to his right lower extremity, back, left shoulder, right and left wrists, and depression and chronic pain, and the need for medical treatment for that injury, and in permanent total disability. I also find that [Pace's] injury on December 9, 2002 in and of itself rendered [Pace] permanently and totally disabled. I find that [Pace] is not able to compete in the open labor market.

In making this determination, the ALJ found Pace's testimony about the accidents and the continued pain he is in to be credible. The ALJ also found the testimony of Pace's medical expert, Dr. Garth Russell, to be credible. Dr. Russell said that, due to Pace's December 9, 2002 injury, Pace has complex regional pain syndrome, that Pace has a torn rotator cuff of the left shoulder with additional injury to his lower back, that Pace has chronic and severe reactive depression, and that Pace has acute and permanent chronic lumbar strain. The ALJ also found the testimony of Pace's other medical expert, Dr. Bernard Abrams, to be credible. Dr. Abrams said that, due to Pace's December 9, 2002 injury, Pace has complex regional pain syndrome, that Pace has chronic depression due to pain, that Pace has acute and chronic low back pain with degenerative disc disease, and that Pace has a torn rotator cuff of the left shoulder. The ALJ

found that Dr. Russell's and Dr. Abrams's testimony that Pace had complex regional pain syndrome were more persuasive than the opinion of the employer's medical expert, Dr. Preston Brent Koprivica, that Pace did not have complex regional pain syndrome. The ALJ found the opinions of Dr. Russell, Dr. Abrams, and Dr. Koprivica that Pace is permanently and totally disabled to be persuasive and credible and found the opinion of Mary Titterington, the vocational rehabilitation counselor, that Pace is not employable on the open market to be persuasive and credible. The ALJ, however, stated that it did not find Dr. Koprivica's testimony credible that Pace's permanent total disability resulted from combining all of the disabling conditions that predated December 17, 2004, with the additional disability attributable to the December 17, 2004, injury. The ALJ found that Pace's permanent and total disability resulted from the December 9, 2002 accident alone and in isolation; that the injuries Pace sustained on November 2, 2004, and December 10, 2004, followed as natural and legitimate consequences of the original accident on December 9, 2002; and that the December 9, 2002 accident resulted in injury to Pace's right lower extremity, back, left shoulder, right and left wrists, and depression and chronic pain.

In regard to Pace's workers' compensation claim for the December 9, 2002 accident, the ALJ awarded Pace permanent and total disability benefits against the City of St. Joseph in the amount of $475.22 per week beginning on February 6, 2005. The ALJ awarded no permanent disability benefits for the remaining three claims. Because the ALJ found that Pace's accident on December 9, 2002, in and of itself,

credible and noted that no other doctor assigned any disability specifically to the December 17, 2004 accident.

rendered him permanently and totally disabled, the ALJ concluded that the Second Injury Fund had no liability. Further, the ALJ determined that the past medical expenses requested by Pace and the Missouri Department of Social Services, MO HealthNet Division lien were "fair and reasonable, usual and customary, necessary, and causally related to [Pace's] December 9, 2002 injury" and should be paid for by the employer. The ALJ also directed the City of St. Joseph to authorize and furnish additional medical treatment to cure and relieve Pace from the effects of his December 9, 2002 injury. Finally, the ALJ found that Pace's attorney was entitled to an attorney's fee of 25 percent of all amounts awarded and entitled to reimbursement of expenses.

The City appealed this decision to the Labor and Industrial Relations Commission, which affirmed the ALJ's decision. The Commission's award attached and incorporated the ALJ's award and decision. The City appeals.

We review the findings of the Commission and not those of the ALJ. *Clayton v. Langco Tool & Plastics, Inc.*, 221 S.W.3d 490, 491 (Mo.App.2007). However, where the Commission's award attaches and incorporates the ALJ's award and decision, as in this case, we consider the findings and conclusions of the Commission as including the ALJ's award. *Id.* This court may modify, reverse, remand for rehearing, or set aside the award of the Commission only if it determines that the Commission acted in excess of its powers, that the award was procured by fraud, that the facts found by the Commission do not support the award, or that there was not sufficient competent evidence in the record to warrant making the award. § 287.495, RSMo 2000. We review the whole record to determine whether there is sufficient competent and substantial evidence to sup-

port the award or if the award is contrary to the overwhelming weight of the evidence. *Hampton v. Big Boy Steel Erection,* 121 S.W.3d 220, 222–23 (Mo. banc 2003).

■ In its first point on appeal, the City contends that the Commission erred in finding that Pace's employment with the City on December 9, 2002, which resulted in Pace's injuring his right knee, was a substantial factor in causing the injuries that occurred in 2004 to Pace's back, hip, and left upper extremity. The City asserts that the Commission misapplied the law to the facts in that the Commission relied on outdated case law to permit recovery for Pace's injuries to his back, hip, and left shoulder where the knee injury was only a triggering or precipitating factor. We disagree.

The Commission made it abundantly clear that Pace's employment with the City on December 9, 2002, which resulted in Pace's injuring his right knee, was a substantial factor in causing Pace's injuries to his back, hip, and left shoulder. The Commission in its determination said:

Based on the competent and substantial evidence and the application of The Missouri Workers' Compensation Law, I find that [Pace] sustained injuries by accident on December 9, 2002 which arose out of and in the course of his employment for Employer, and that [Pace's] injuries were clearly work related, and that his December 9, 2002 accident was a substantial factor in causing both the resulting medical condition and disability.

I find the ... December 9, 2002 accident resulted in Claimant's right knee to become weak and unstable, and caused his right knee to give out on him at times. I find his right knee gave out on him on November 2, 2004 and on December 10, 2004 because of the Decem-

ber 9, 2002 accident, and that [Pace] sustained additional injuries on November 2, 2004 and December 10, 2004 in the course of his employment for Employer. I find that the injuries [Pace] sustained on December 9, 2002, November 2, 2004, and December 10, 2004 resulted in permanent and total disability, and that [Pace's] resultant permanent total disability is directly traceable to his December 9, 2002 accident. I find that the injuries [Pace] sustained on November 2, 2004 and December 10, 2004 followed as natural and legitimate consequences of the original accident on December 9, 2002. I find the falls on November 2, 2004 and December 10, 2004 were not separate and distinct injuries from the December 9, 2002 injury.

I find that [Pace] has met his burden to prove that he sustained an injury that was clearly work related, and that his work for Employer was a substantial factor in causing injury to his right lower extremity, back, [and] left shoulder[.]

In so concluding, the Commission stated: An injury is clearly work related, "if work was a substantial factor in the cause of the resulting medical condition or disability. An injury is not compensable merely because work was a triggering or precipitating factor." *Kasl v. Bristol Care, Inc.*, 984 S.W.2d 852 (Mo. 1999).[3] Injuries that are triggered or precipitated by work may nevertheless be compensable if the work is found to be a "substantial factor" in causing the injury. *Kasl*, 984 S.W.2d at 853; *Cahall v. Cahall*, 963 S.W.2d 368, 372 (Mo.App. 1998).[4] A substantial factor does not have to be the primary or most significant causative factor. *Bloss v. Plastic Enterprises*, 32 S.W.3d 666, 671 (Mo. App.2000);[5] *Cahall*, 963 S.W.2d at 372.

An accident may be both a triggering event and a substantial factor in causing an injury. *Bloss*, 32 S.W.3d at 671. Further, there is no "bright-line test or minimum percentage set out in the Workers' Compensation Law defining 'substantial factor.'" *Cahall*, 963 S.W.2d at 372.

The City notes, however, that, in addition to the above cited case law, the Commission cited cases that were decided long before the Workers' Compensation Act was amended in 1993 to require a claimant's employment to be a substantial factor in causing the injury. *See* § 287.020.3(2), RSMo 1994.[6] In particular, the Commis-

---

**3.** In its 2005 amendment to section 287.020, the legislature included subsection 10, which states specifically:

> In applying the provisions of this chapter, it is the intent of the legislature to reject and abrogate earlier case law interpretations on the meaning of or definition of "accident", "occupational disease", "arising out of", and "in the course of the employment" to include, but not be limited to, holdings in: *Bennett v. Columbia Health Care and Rehabilitation*, 80 S.W.3d 524 (Mo.App. W.D. 2002); *Kasl v. Bristol Care, Inc.*, 984 S.W.2d 852 (Mo. banc 1999); and *Drewes v. TWA*, 984 S.W.2d 512 (Mo. banc 1999) and all cases citing, interpreting, applying, or following those cases.

Thus, *Kasl* has now been superseded by statute as recognized in *Lawson v. Ford Motor*

*Co.*, 217 S.W.3d 345 (Mo.App.2007) and *Hager v. Syberg's Westport*, 304 S.W.3d 771 (Mo. App.2010).

**4.** *Cahall* was overruled on other grounds by *Hampton*, 121 S.W.3d at 226.

**5.** *Bloss* was overruled on other grounds by *Hampton*, 121 S.W.3d at 226.

**6.** After the 1993 amendment, section 287.020.3(2)(a) said: "An injury shall be deemed to arise out of and in the course of the employment only if ... [i]t is reasonably apparent, upon consideration of all the circumstances, that the employment is a substantial factor in causing the injury[.]" Section 287.020 was amended again in 2005, after Pace's injuries in this case, and now

sion cited *Manley v. Am. Packing Co.*, 363 Mo. 744, 253 S.W.2d 165 (1952), *Wilson v. Emery Bird Thayer Co.*, 403 S.W.2d 953 (Mo.App.1966); *Lahue v. Mo. State Treasurer*, 820 S.W.2d 561 (Mo.App.1991); and *Lawson v. Lawson*, 415 S.W.2d 313 (Mo. App.1967).[7] The City claims that the Commission relied on this outdated case law to find that an accident " 'need not have been the sole or direct cause of the condition complained of, it being sufficient if it is an efficient, exciting, superinducing, concurring or contributing cause[.]' " *Manley*, 253 S.W.2d at 169 (citation omitted).

The Commission findings and conclusions make it clear that it was citing the above mentioned cases for the principle that an employer is liable for the natural consequences of the original work injury when work is a substantial factor in causing the medical condition. The Commission was well aware, and even acknowledged in its conclusions of law, that work must be a substantial factor in causing the resulting medical condition or disability and that an injury is not compensable if work was merely a triggering or precipitating factor of the injury. Injuries that are triggered or precipitated by work, however, may nevertheless be compensable if work is found to be a "substantial factor" in causing the injury. *Cahall*, 963 S.W.2d at 372. Therefore, under the 1993 amendments to section 287.020.3, an employer may still be liable for all injuries resulting from an original injury at work so long as the claimant's employment was a substantial factor in causing the resulting injuries. Thus, when work is a substantial factor in causing the medical con-

dition, "every natural consequence that flows from the injury, including a distinct disability in another area of the body, is compensable as a direct and natural result of the primary or original injury." *Cahall v. Riddle Trucking, Inc.*, 956 S.W.2d 315, 322 (Mo.App.1997), *overruled on other grounds by Hampton*, 121 S.W.3d at 226.

The Commission clearly applied the substantial factor test when it found that Pace's work with the City on December 9, 2002, which resulted in Pace's injuring his right knee, was a substantial factor in causing Pace's injuries to his back, hip, and left upper extremity in 2004. The City's argument that the Commission erroneously applied the law is without merit.

To the extent that the City contends that Pace's work with the City on December 9, 2002, which resulted in his knee injury, was not a substantial factor in causing Pace's 2004 injuries, its contention is also without merit. Dr. Russell testified by way of deposition that "the initial injury of December 9, 2002 caused the injury to [Pace's] knee with the subsequent complex regional pain syndrome requiring medication and treatment and the deep vein thrombosis. [Pace's] knee then buckled, was not trustworthy, caused him to fall these multiple times[.] [S]o[,] it all relates back to that one injury." Dr. Russell said that it was his opinion that Pace's right knee buckled and caused him to fall on November 2, 2004, and December 10, 2004, and that Pace's knee buckled because of the injury he sustained on December 9, 2002. Moreover, Dr. Abrams diagnosed Pace as suffering from complex regional pain syndrome of the right lower extremi-

provides that "[a]n injury by accident is compensable only if the accident was the prevailing factor in causing both the resulting medical condition and disability. 'The prevailing factor' is defined to be the primary factor, in relation to any other factor, causing both the

resulting medical condition and disability." § 287.020.3(1), RSMo Cum.Supp.2011.

7. *Lawson* was overruled on other grounds by *Hampton*, 121 S.W.3d at 232.

ty, secondary to his injury of December 9, 2002, arthroscopic surgery of January 10, 2003, and deep vein thrombosis of January 16, 2003. He further stated that as a consequence of this diagnosis, Pace has acute and chronic low back pain with degenerative disc disease due to a fall on November 2, 2004, and a torn rotator cuff of the left shoulder due to a fall on December 10, 2004. Dr. Abrams's report emphasized that Pace's November and December 2004 falls were due to his right leg weakness and that the right leg weakness was due to the original December 9, 2002 work injury and accident. Competent and substantial evidence supported the Commission's determination that Pace's employment with the City on December 9, 2002, which resulted in Pace's right knee injury, was the substantial factor in causing Pace's right knee to give out and in causing him to fall on November 2, 2004, and on December 10, 2004, and resulted in Pace's injuring his back, hip, and left upper extremity. Point I is denied.

▪ In its second point on appeal, the City contends that the Commission's decision that Pace was permanently and totally disabled based upon the December 9, 2002 knee injury alone was not supported by substantial and competent evidence and was contrary to the overwhelming weight of the evidence. The City asserts that Pace offered equivocal and contradictory expert testimony from Dr. Abrams and Dr. Russell on this issue and that the City's experts were in agreement that Pace was permanently and totally disabled on the basis of a combination of his injuries and his advanced age. We disagree.

The City contends that, where a claimant offers conflicting evidence on causation, he fails to meet his burden of proof on the issue. In support of this contention, the City relies on this proposition:

Whatever may be the quantum of proof the law imposes on a given issue in a compensation case, ... such proof is made only by competent and substantial evidence and may not rest of surmise or speculation. The contradictory testimony of a single witness relied on to prove a fact does not constitute substantial evidence and is not probative of that fact in the absence of an explanation or other circumstances tending to explain the contradiction.

*Griggs v. A.B. Chance Co.,* 503 S.W.2d 697, 703–04 (Mo.App.1973).

In regard to Dr. Abrams's opinion, the City claims that Dr. Abrams's opinion that Pace's back, hip, and left upper extremity injuries resulted from the December 9, 2002 knee injury is equivocal at best. In particular, City points to Dr. Abrams's deposition testimony where Dr. Abrams states that Pace was permanently and totally disabled from all the various injuries and that when you add up the left shoulder, the knee, the complex regional pain syndrome, the depression, the lower back, all of these things combined to make Pace totally disabled. The City asserts that nowhere did Dr. Abrams state that the buckling of Pace's right knee or his right leg weakness was a substantial factor in causing the injuries to his back, hip, and shoulder.

But, as we noted previously, the evidence established that Dr. Abrams diagnosed Pace as suffering from complex regional pain syndrome of the right lower extremity, secondary to his injury of December 9, 2002, arthroscopic surgery of January 10, 2003, and deep vein thrombosis of January 16, 2003. Dr. Abrams further stated that "as a consequence" of this diagnosis, Pace has acute and chronic low back pain with degenerative disc disease due to a fall on November 2, 2004, and a torn rotator cuff of the left shoulder due to

a fall on December 10, 2004. Dr. Abrams's supplementary report emphasized that Pace's November and December 2004 falls were "attributable to the weakness of [Pace's] right leg attendant his original injury." Dr. Abrams's report stated, "Mr. Pace suffered falls November 2, 2004 and December 10, 2004 due to right leg weakness. Therefore, they are a result of right leg weakness due to his original injury" on December 9, 2002. Moreover, in his deposition testimony, Dr. Abrams specifically stated that Pace "fell on November 2nd and December 10th due to right leg weakness." Further, when questioned on cross-examination whether the slipping on the steps on December 10, 2004, was a separate event, Abrams stated, "Well, yes, with the proviso that [Pace] attributed it to the weakness of his right leg."

As to Dr. Russell's testimony, the City claims that his testimony is more equivocal than that of Dr. Abrams. The City contends that Dr. Russell merely stated that the 2004 fall on the stairs was "consistent with" the right knee injury. Specifically, Dr. Russell stated:

> [Pace], by history, fell upon several occasions, but the two major ones occurred when he fell down marble steps in November of 2004.[8] He sustained additional injury to his back and to his shoulders. This fall is consistent with a patient who has dysfunction of his right knee with pain in the right lower extremity."

The City also points to Dr. Russell's opinion which finds that Pace was totally disabled because of a combination of all the injuries and not merely due to the December 9, 2002 injury. However, Dr. Russell testified that "the initial injury of December the 9th of 2002 caused the injury to

[Pace's] knee with the subsequent complex regional pain syndrome requiring medication and treatment and the deep vein thrombosis. [Pace's] knee then buckled, was not trustworthy, caused him to fall these multiple times[.] [S]o[,] it all relates back to that one injury." Dr. Russell said that it was his opinion that Pace's right knee buckled and caused him to fall on November 2, 2004, and December 10, 2004, and that Pace's knee buckled because of the injury he sustained on December 9, 2002.

Dr. Abrams's and Dr. Russell's opinions were not equivocal and contradictory. From the testimony and reports of Dr. Abrams and Dr. Russell, the Commission could infer that the condition of Pace's right leg as a result of the December 9, 2002 injury was the substantial factor in causing Pace's right knee to give out and in causing Pace to fall on November 2, 2004, and December 10, 2004. Although neither Dr. Abrams nor Dr. Russell used the phrase "substantial factor" in their opinions, phrases such as "due to," "result of," "related to," and "secondary to" are sufficient to support the Commission's conclusion that the original injury was a substantial factor in causing Pace's injuries and overall disability.

Even the City's expert, Dr. Koprivica, conceded that Pace's right knee was weak, unstable, and particularly vulnerable to giving out as a result of the December 9, 2002 injury. Dr. Koprivica also conceded that Pace's right knee giving out on November 2, 2004, was related to the chronic pain in his right knee and that the fall aggravated the pain in his right knee. Similarly, Dr. Koprivica opined that the weakness in Pace's right leg was a substantial factor in his December 10, 2004

---

8. The evidence does not indicate that Pace fell down marble steps twice in November 2004.

The evidence establishes that Pace fell in November and in December 2004.

fall and that his right leg pain was again aggravated in that fall. To the extent that Dr. Koprivica found that Pace's multiple injuries and his age combined to render him permanently and totally disabled and that no one injury, alone and in isolation, was responsible for Pace's permanent and total disability, the Commission was not required to believe Dr. Koprivica's opinion on this issue. "The Commission is free to believe or disbelieve any evidence, and we defer to the Commission's credibility determinations and to the weight it accords testimony and evidence." *Treasurer of the State of Mo.–Custodian of the Second Injury Fund v. Cook,* 323 S.W.3d 105, 110 (Mo.App.2010). "Where the opinions of medical experts are in conflict, the fact finding body determines whose opinion is the most credible." *Kelley v. Banta & Stude Const. Co.,* 1 S.W.3d 43, 48 (Mo.App. 1999). "Where there are conflicting medical opinions, the fact finder may reject all or part of one party's expert testimony which it does not consider credible and accept as true the contrary testimony given by the other litigant's expert." *Id.*

Given Dr. Abrams's and Dr. Russell's testimony and reports, competent and substantial evidence supported the Commission's determination that Pace was permanently and totally disabled as a result of the December 9, 2002 right knee injury alone. Even if the evidence lends itself to differing factual inferences, we are obligated to defer to the Commission's findings unless those findings are contrary to the overwhelming weight of the evidence. *Vickers v. Mo. Dept. of Public Safety,* 283 S.W.3d 287, 295 (Mo.App.2009). The Commission's finding that the December 9, 2002 injury was the substantial factor in causing Pace's right knee to give out and in causing Pace to fall on November 2, 2004, and December 10, 2004, was not contrary to the overwhelming weight of the evidence. Pace, therefore, met his

burden of proving that his disability and medical condition resulted from the December 9, 2002 injury alone. Point II is denied.

In its third point on appeal, the City contends that the Commission's finding that Pace's back pain was a result of the December 9, 2002 knee injury was not supported by competent and substantial evidence. The City claims that Pace's testimony and opinions by his medical experts are directly contradicted by medical records documenting treatment for back, neck, and shoulder pain for at least two years before the December 9, 2002 knee injury.

Although medical records from 2000 reflect that Pace was being treated for left shoulder pain, left neck pain, and a herniated disc or a small central disk bulge due to a car accident that Pace had in December of 1998, Pace testified that after two years, the pain "diminished to a point where it really wasn't a problem maybe just an aggravation[.]" Pace said that he returned to work without any restrictions and that his employer did not have to provide him with any work accommodations due to the injury. When asked whether he had any permanent injuries from the car accident, Pace replied, "In the beginning I was very sore but again within two and a half years or within two years or so, it finally cut down to where it wasn't anything to worry about." Moreover, in regard to the back pain, Pace's medical records from 2000 concerning the MRI of the cervical region of the spine and the herniated disc or a small central disk bulge do not reflect that Pace was having problems with his lower back, which is the area Pace complained about after the November and December 2004 falls.

Moreover, the evidence established that, after Pace fell in November and December

2004, Pace suffered from lower back pain. Dr. Russell diagnosed Pace as suffering from "acute and chronic lumbar strain superimposed upon pre-existing degenerative disc disease, lumbar area, secondary to a fall occurring on November the 2nd of 2004." Further, Dr. Russell diagnosed Pace as suffering from "a tear of the rotator cuff of the left shoulder with additional injury to his lower back due to a fall on December 10th of 2004." Dr. Russell said that, based upon Pace's history and his physical records, the cause of Pace's acute and chronic lumbar strain was "due to a fall that occurred on the marble steps of the City Hall of St. Joseph, Missouri and which caused the pain in his lower back." Dr. Russell opined that Pace's chronic muscle spasms and reduced range of motion in his lower back would interfere with Pace's ability to pursue gainful employment. Dr. Russell believed that, due to Pace's December 9, 2002 knee injury, Pace's right knee buckled and caused him to fall on November 2, 2004, and December 10, 2004, and resulted in Pace suffering from back pain. Further, as noted previously, Dr. Abrams diagnosed Pace as suffering from complex regional pain syndrome of the right lower extremity, secondary to his injury of December 9, 2002, arthroscopic surgery of January 10, 2003, and deep vein thrombosis of January 16, 2003. Dr. Abrams further stated that "as a consequence" of this diagnosis, Pace has acute and chronic low back pain with degenerative disc disease due to a fall on November 2, 2004, and a torn rotator cuff of the left shoulder due to a fall on December 10, 2004. Dr. Abrams's supplementary report emphasized that Pace's "soft tissue and low back" issues were a result of the falls Pace suffered on November 2, 2004, and December 10, 2004, and that the falls were a result of right leg weakness due to Pace's original injury on December 9, 2002. Given Pace's, Dr. Russell's, and

Dr. Abrams's testimony, substantial and competent evidence supported the Commission's determination that Pace's back pain was a result of the December 9, 2002 knee injury. Point III is denied.

■ In its fourth point on appeal, the City contends that the Commission's determination that Pace was entitled to benefits for bilateral carpal tunnel syndrome due to the December 9, 2002 knee injury was not supported by competent and substantial evidence and was contrary to the overwhelming weight of the evidence. The City asserts that the testimony of Dr. Abrams on this issue lacked foundation and should be accorded little weight and that the medical records established that Pace was diagnosed with carpal tunnel syndrome two years before the December 9, 2002 knee injury.

The City points to medical records from Dr. Matthew M. Keum in May 2000, in which Dr. Keum noted that he was treating Pace for pain in his left shoulder and left neck. The records noted that an EMG/NCV study was performed on Pace's left upper extremity and a "preliminary report" revealed "mild to moderate carpal tunnel syndrome in the left wrist[.]" Nothing in Dr. Keum's records established that Pace had complaints of hand or wrist pain at the time the EMG/NCV study was ordered. Thus, the preliminary finding of mild to moderate carpal tunnel syndrome in the left wrist was an *incidental* finding and was not prompted by symptoms or patient complaints. No treatment was given or recommended by Dr. Keum for the preliminary finding of mild to moderate carpal tunnel syndrome; Pace was merely instructed about avoiding any repetitive and excessive left wrist extension or flexion. At best, Dr. Keum's records demonstrate that Pace may have had some asymptomatic carpal tunnel syndrome in

his left wrist in May 2000 as indicated by a "preliminary report."

The evidence established that, after Pace's December 9, 2002 accident, Dr. Bruce Smith prescribed a cane for Pace to use. When Pace started using a cane to walk, he held it in his right hand but holding the cane in his right hand became painful. So, Pace began alternating the cane between his left and right hands. He then started experiencing pain in both hands, which would be a solid, constant pain that would get sharp if he gripped or held anything. According to Pace, he would alternate the cane between hands, and, when one hand would become numb, he would either drop the cane or feel like doing so. Pace said that he did not have hand pain like this before using the cane. He was ultimately diagnosed with carpal tunnel syndrome in both hands and underwent surgery on both sides.

The treatment records are consistent with Pace's testimony. Dr. DePriest records noted that Pace had bilateral carpal tunnel syndrome and was "a crutch walker." Further, Dr. DePriest's notes indicated that Mr. Pace's ability to handle crutch ambulation was dependent on the success of the surgery. Dr. David Cathcart, who initially treated the carpal tunnel syndrome, noted that the main problem Pace had was with "gripping." Dr. Cathcart's records reflected that Pace used a cane because Pace's right leg would give out and that Pace's hands became increasingly painful after he started using a cane. Moreover, Dr. Abrams rated Pace as having a 10 percent disability at the level of each wrist as a result of the carpal tunnel syndrome and opined that the carpal tunnel syndrome resulted from Pace's use of "assistive devices and the switching the device from the proper left hand to right due to pain and weakness of his left arm." With this evidence, Pace met his burden of producing evidence "from which it reasonably may be found that such injury resulted from the cause for which the employer would be liable." *Blankenship v. Columbia Sportswear*, 875 S.W.2d 937, 942 (Mo. App.1994), *overruled on other grounds by Hampton*, 121 S.W.3d at 228.

To the extent that the City complains about Dr. Abram's opinion, "[t]he weight afforded a medical expert's opinion is exclusively within the discretion of the Commission." *Bond v. Site Line Surveying*, 322 S.W.3d 165, 170 (Mo.App. 2010). The acceptance or rejection of medical evidence is for the Commission. *Smith v. Donco Constr.*, 182 S.W.3d 693, 701 (Mo.App.2006). Although the City's expert, Dr. Koprivica, did not see an association between Pace's carpal tunnel syndrome and his work injuries, it was "up to the Commission, not this court, to decide which of the two lines of expert reasoning was more credible as to causation." *Kent v. Goodyear Tire & Rubber Co.*, 147 S.W.3d 865, 871 (Mo.App.2004). "Where competent evidence or permissible inferences conflict, 'the choice rests with the Commission and is binding upon this court.'" *Clayton*, 221 S.W.3d at 493 (citation omitted). The Commission determined that Dr. Koprivica's testimony was not credible and concluded that "the December 9, 2002 accident resulted in injury to [Pace's] ... right and left wrists[.]" We defer to the Commission on the issues of the weight and credibility given to medical testimony. *ABB Power T & D Co. v. Kempker*, 236 S.W.3d 43, 49 (Mo.App. 2007).

Substantial and competent evidence supported the Commission's determination that Pace's bilateral carpal tunnel syndrome resulted from the December 9, 2002 knee injury, and such determination was not against the overwhelming weight of the evidence. Point IV is denied.

In its fifth point on appeal, the City contends that the Commission's determination that Pace was entitled to benefits for complex regional pain syndrome (CRPS) due to the December 9, 2002 knee injury was not supported by competent and substantial evidence and was contrary to the overwhelming weight of the evidence. The City asserts that the testimony of Dr. Russell and Dr. Abrams on this issue lacked foundation and should be accorded little weight and that the medical records established that Pace was treated for chronic pain complaints at least two years before the December 9, 2002 knee injury.

The City complains that Dr. Russell's deposition testimony is inconsistent with the deposition testimony of Dr. Abrams in regard to the generally accepted diagnostic criteria for CRPS. In particular, Dr. Russell testified that there were no generally accepted diagnostic criteria for CRPS and that it is "a subjective diagnosis." Dr. Abrams, however, testified:

> CRPS I is a painful condition which must meet certain clinical criteria. These criteria should be explicitly stated, whether the diagnosis is endorsed or not. Often, as in this case, both endorsers and deniers of the condition do not give enough information to retrospectively validate their opinions. Therefore, the records of endorsers, Drs. Cathcart and Russell as well as deniers, Dr. DiStefano, Smith, Wheeler, and Baade do not contain the necessary elements for comments.

The City asserts that, because Dr. Abrams did not consider Dr. Russell's analysis adequate to support a diagnosis of CRPS, the Commission should not have relied upon Dr. Russell's testimony to support its determination that Pace was entitled to benefits for CRPS due to the December 9, 2002 knee injury. Additionally, the City contends that, because there was a conflict between Pace's two expert opinions, the Commission was "left without definitive evidence on the issue of CRPS." According to the City, by offering conflicting testimony, Pace eroded the foundation for his claim of CRPS resulting from the 2002 work injury and, therefore, failed to meet his burden of proof on the issue.

In support of its contention the City again relies on *Griggs v. A.B. Chance Company*, 503 S.W.2d at 703–04, wherein the court said:

> Whatever may be the quantum of proof the law imposes on a given issue in a compensation case, ... such proof is made only by competent and substantial evidence and may not rest of surmise or speculation. The contradictory testimony of a single witness relied on to prove a fact does not constitute substantial evidence and is not probative of that fact in the absence of an explanation or other circumstances tending to explain the contradiction.... [T]estimony [that] gives rise to two utterly inconsistent inferences ... does not allow a substantial basis from which a compensable injury can be inferred.

*Griggs*, however, is of no aid to the City because *Griggs* concerns the contradictory testimony of a single witness. Dr. Russell's testimony does not give rise to "two utterly inconsistent inferences" as to whether the December 9, 2002 knee injury caused the CRPS. In fact, his testimony was quite consistent. Although he opined that there were no generally accepted diagnostic criteria for CRPS, Dr. Russell said that there are certain conditions that confirm the diagnosis and that there are 23 different symptoms or changes that can occur with the diagnosis. He stated:

> [CRPS] is following an injury or surgery or some disease conditions, the patient gets a condition in which there is abnor-

mal severe pain that can go into any part of the body and this pain is continuous, can be aggravated by many stimulating factors such as touching or squeezing or weight bearing. And it also affects all of the other nerves. For example, the skin may, reaches different color. It may become smooth. The muscles may atrophy. There's about 23 different symptoms that comes with what's known as complex regional syndrome.

Dr. Russell said that he based Pace's diagnosis of CRPS on three things: (1) Pace's history with his injury, his subsequent surgery, and his continued pain; (2) a review of medical records from Pace's treating physicians; and (3) an examination of Pace and Pace's description of the symptoms that he was having. When asked whether he was able to reach an opinion about what caused Pace's CRPS, Dr. Russell emphatically stated that Pace's CRPS "was secondary to the injury that he had on December the 9th of 2002 which resulted in the surgical intervention of January the 10th of 2003 and that the [CRPS] occurred following the surgery."

Further, although Dr. Abrams disagreed with Dr. Russell's statement that there were no generally accepted diagnostic criteria for CRPS, Dr. Abrams and Dr. Russell's ultimate diagnosis were consistent. According to Dr. Abrams:

Chronic Regional Pain Syndrome is, first of all, a painful condition which goes on for more than three months and which is characterized by a number of criteria. One's sensory, and [Pace] does have abnormal sensory findings; that is, things that are ordinarily non-painful are painful, and that was demonstrated by spraying him with cold, observing his pulse. He also has edema or swelling, which he clearly has. He has trophic changes which are changes in the skin striations, changes in the color. He has vasomotor phenomena which are changes in color of the extremities and temperature of the extremities.

So he really has—oh, and he has motor, which is weakness. So he really has the gamut of findings that you see in Complex Regional Pain Syndrome I.

. . . .

. . . You have to have symptoms and signs in the category of pain where he has them. Obviously he has complaints of pain and he has findings of pain. You have to have vasomotor phenomena where he has objective signs of violet color, colder temperature. You have to have edema, which he has. You have to have trophic changes, which he has, loss of skin striation, and you should have motor changes, you know, what you really need is you need symptoms and—symptoms from—from let's say four of those categories. [Pace] had symptoms from those, and you need signs from three, one sign from three, and he's got more than that.

Dr. Abrams said that Pace has CRPS "secondary to his injury December 9, 2002, arthroscopic surgery January 10th, 2003, and then he had had a deep vein thrombosis January 16th, 2003."

The Commission found Dr. Russell's and Dr. Abrams's opinions that Pace has CRPS and that the December 9, 2002 knee injury caused the CRPS to be credible. That the City's expert, Dr. Koprivica, found that Pace had none of the criteria for a diagnosis of CRPS and that it was his opinion that Pace was not suffering from that condition is of no consequence. The Commission specifically found that Dr. Russell's and Dr. Abrams's opinions that Pace has CRPS "are more persuasive than the opinion of Dr. Koprivica that [Pace] does not have complex regional pain syndrome." "Where the opinions of medical

experts are in conflict, the fact finding body determines whose opinion is the most credible." *Kelley*, 1 S.W.3d at 48. We defer to the Commission on the issues of the weight and credibility given to medical testimony. *ABB Power*, 236 S.W.3d at 49.

█ To the extent that the City argues that Pace did not suffer from CRPS as a result of the December 9, 2002 right knee injury because medical records established that Pace was undergoing treatment for a chronic pain condition two years before the right knee injury, its contention is without merit. The medical records from 2000 which the City relies upon to support it contention do not contain a diagnosis of CRPS. At most, the records show that Pace was taking two prescription pain medications, a muscle relaxer, and had a TENS unit for neck and left shoulder pain due to a motor vehicle accident that occurred in 1998. Such evidence does not establish that Pace was suffering from CRPS in 2000.

Substantial and competent evidence supported the Commission's determination that Pace's CRPS resulted from the December 9, 2002 knee injury, and such determination was not against the overwhelming weight of the evidence. Point V is denied.

█ In its sixth and final point on appeal, the City contends that the Commission's determination that Pace was entitled to benefits for chronic reactive depression due to the December 9, 2002 knee injury was not supported by competent and substantial evidence and was contrary to the overwhelming weight of the evidence. In particular, the City asserts that the testimony of Dr. Russell and Dr. Abrams on this issue lacked foundation and should be accorded little weight and that Pace failed to offer evidence by a mental health professional to establish his diagnosis of depression or that the depression resulted from the 2002 right knee injury.

In concluding that Pace suffered from depression as a result of his 2002 right knee injury, the Commission relied on the opinions of Dr. Russell and Dr. Abrams. Dr. Russell said that he diagnosed Pace as suffering from chronic and severe reactive depression based upon his examination and questioning of Pace, Pace's history of treatment and medication, and Pace's treatment for CRPS. Dr. Russell said that reactive depression is a known complication of treatment for CRPS and is a depression secondary to some other condition or medication "that is causing the body to chemically function not at its full capacity." Although the City argues that Russell is not a mental health expert qualified to diagnose depression, Dr. Russell testified that he is qualified to diagnose depression. Dr. Russell said, "[O]rthopedic surgeons treat depression, and depression is one of the conditions that we see in patients, and we do treat them actively and I treat them now." Dr. Russell said that he diagnosed depression and prescribed medications for patients every week in his orthopedic practice. Dr. Russell testified that, as a part of his medical training, he spent six months in psychiatric training and that such training involved diagnosing and treating depression. Dr. Russell noted that, if a physician cannot determine the cause of the depression, then a psychiatrist is in the best position to do so. But, Dr. Russell said that, once a proper diagnosis is made, the depression can be treated by many physicians and specialists. Further, Dr. Abrams diagnosed Pace as suffering from chronic depression "due to pain." Dr. Abrams said that the depression was a natural consequence of his illness. Although Dr. Abrams said that he was not a psychiatrist, he said that he was trained in psychiatry. The Commission found both Dr. Russell's and Dr. Abrams's testimony

to be credible. We defer to the Commission on the issues of the weight and credibility given to medical testimony. *ABB Power*, 236 S.W.3d at 49.

The City argues that, because Pace admitted that he was not treated for depression until 2006, which was four years after the December 9, 2002 right knee injury, no evidence established the depression resulted from that injury. Dr. Russell and Dr. Abrams, however, testified that Pace's depression was due to the pain he was suffering from as a result of that injury and its sequela.

Substantial and competent evidence supported the Commission's determination that Pace's chronic reactive depression resulted from the December 9, 2002 knee injury, and such determination was not against the overwhelming weight of the evidence. Point VI is denied.

## Conclusion

The Commission did not erroneously apply the law regarding the substantial factor test when it found that Pace's employment with the City on December 9, 2002, which resulted in Pace's right knee injury, was a substantial factor in causing Pace's injuries to his back, hip, and left upper extremity in 2004. Competent and substantial evidence supported the Commission's determination that Pace's employment with the City on December 9, 2002, which resulted in Pace's right knee injury, was the substantial factor in causing Pace's right knee to give out and in causing him to fall on November 2, 2004, and on December 10, 2004, and resulted in Pace's injuring his back, hip, and left upper extremity. Moreover, competent and substantial evidence supported the Commission's determination that Pace was permanently and totally disabled as a result of the December 9, 2002 right knee injury alone. Further, competent and substantial evidence supported the Commission's determination that Pace's back pain, bilateral carpal tunnel syndrome, complex regional pain syndrome and chronic reactive depression were a result of the December 9, 2002 knee injury. We, therefore, affirm the Labor and Industrial Relations Commission's determination that Gary Pace was entitled to permanent and total disability benefits for a knee injury he sustained at work on December 9, 2002.

All concur.